## STATE OF CONNECTICUT *v.* RICKY ELLIS
### (14808)

CALLAHAN, BERDON, NORCOTT, KATZ and M. HENNESSEY, Js.

Argued December 2, 1994—decision released April 18, 1995

*Elizabeth M. Inkster,* assistant public defender, for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* chief state's attorney, *Warren Maxwell,* assistant state's attorney, and *Rosita M. Creamer,* senior assistant state's attorney, for the appellee (state).

NORCOTT, J. The principal issue in this appeal is whether the defendant, Ricky Ellis, was deprived of his federal constitutional right to a jury selected from a fair cross section of the community. We conclude that the defendant has failed to establish such a violation and we therefore affirm the judgment of the Appellate Court.[1]

The defendant was convicted after a jury trial of robbery in the first degree in violation of General Stat-

---

[1] Although the defendant asks us to review his claims under both the sixth and the fourteenth amendments to the United States constitution and article first, §§ 8 and 19, of the Connecticut constitution, our decision is limited to the United States constitution because the defendant has failed to provide an independent analysis of the state constitutional issues. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Citations omitted.) *State* v. *Robinson,* 227 Conn. 711, 721–22, 631 A.2d 288 (1993); see also *State* v. *Williams,* 231 Conn. 235, 245 n.13, 645 A.2d 999 (1994); *State* v. *Joyner,* 225 Conn. 450, 458 n.4, 625 A.2d 791 (1993); *State* v. *Rosado,* 218 Conn. 239, 251 n.12, 588 A.2d 1066 (1991).

utes § 53a-134 (a) (4),[2] and larceny in the first degree in violation of General Statutes § 53a-122 (a) (3).[3] The trial court sentenced him to a total term of eight years imprisonment, suspended after three years, and three years probation with drug counseling.[4] The defendant filed posttrial motions for acquittal and for a new trial, both of which were denied.

Thereafter, the defendant appealed to the Appellate Court challenging the manner in which his jury panel was selected. The Appellate Court affirmed the convictions without opinion. *State* v. *Ellis*, 31 Conn. App. 923, 626 A.2d 1 (1993). We granted certification[5] and remanded the matter to the trial court for an eviden-

[2] General Statutes § 53a-134 provides in relevant part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[3] General Statutes § 53a-122 provides in relevant part: "LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars . . . ."

[4] We note that the defendant's period of incarceration has been completed. He remains on probation.

[5] We granted certification limited to the following issues: (1) "Was the Appellate Court correct in concluding the defendant's rights were not violated by an instruction defining reasonable doubt as 'a doubt for which a valid reason can be assigned . . . such a doubt as in serious affairs which concern you in everyday life you would pay some strict attention to' and by an instructional caveat limiting the presumption of innocence to protect[ing] the innocent and not the guilty?" and (2) "Was the May 17, 1991 panel of venirepersons summoned in a manner that violated the defendant's constitutional right to a jury selected from a fair cross section of the community?" *State* v. *Ellis*, 227 Conn. 902, 630 A.2d 73 (1993).

tiary hearing as to the circumstances surrounding the selection of venirepersons in *State* v. *Webb*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89 371150 (September 12, 1991). The jurors in *Webb* were drawn from the same venire pool as the jurors in this case.[6] In particular, we asked the trial court to determine whether a supplemental panel, requested for the *Webb* trial, was selected randomly and if the panel was not selected randomly, whether the selection process in the *Webb* case impermissibly tainted the venire panel from which the defendant's jury was selected.

On remand, the trial court held an evidentiary hearing and the parties filed briefs on the factual issues presented. The trial court found the following facts: "At all times pertinent to this question, as well as the second question, in the Hartford-New Britain judicial district, venirepersons were summoned for a four week period of service with a new group of venirepersons reporting for service on each Tuesday.

\* \* \*

"On May 15, 1991, *State* v. *Webb* was on trial. Mr. Webb was charged with capital felony in violation of General Statutes § 53a-54. On that date jury selection was proceeding before the Honorable Thomas H. Corrigan. Because of the nature of the case and the number of peremptory challenges, this case required a large number of venirepersons.

"Attorneys Fred DeCaprio and Ronald Gold had been appointed to represent Mr. Webb. On May 10, 1991, Mr. Webb began serving as his own attorney. On May 15, Webb was appearing pro se with attorneys DeCaprio and Gold as his stand-by counsel. DeCaprio

---

[6] The *Webb* jury selection occurred on May 15, 1991. The *Ellis* jury selection occurred on May 17, 1991.

and Gold had obtained a copy of a newly released census report which indicated that 10.2 percent of the population of Hartford county was black. The attorneys, as well as Mr. Webb, were concerned by the underrepresentation of black people on the panel of venirepersons assigned to the trial. The panel which they would be working with that day consisted of thirty-six persons, two of whom were black. [T]his was less than the percentage indicated in the census report.

"Prior to the opening of court on the fifteenth both attorneys met with Mr. Webb. They discussed the underrepresentation and it was decided that the problem should be presented to the judge prior to the start of voir dire. There is a question as to Webb's participation in this decision. At the very least he was aware of what the attorneys intended to do and he did not object. Later in court he did object to the chambers conference without his presence.

"At the request of Mr. Gold, a conference was held in chambers with Judge Corrigan. In attendance were attorneys DeCaprio and Gold as well as assistant state's attorneys Rosita M. Creamer and Dennis J. O'Conner who were prosecuting the case. At this conference DeCaprio and Gold raised the issue of underrepresentation of black people on the jury and stated that Mr. Webb was considering a challenge to the array.

"Ms. Diane Aviles was then a jury clerk for the Hartford-New Britain judicial district. Her duties included the drawing of names and the assembling of panels for voir dire using the procedure previously stated. At the chambers conference, with the attorneys present, Judge Corrigan called Ms. Aviles and inquired if there were any black jurors left in the assembly room. Ms. Aviles, who from her office could observe jurors in the assembly area, informed the judge that there appeared to be black jurors in attendance, but she could

not tell if they were available. These were people who had been rejected or sent back from various juries. . . .

"Attorney Gold stated to the judge that if there were additional black persons they could simply be added to the panel. He reported that this had been done in another case in which he had been involved.

"Judge Corrigan then initiated a second telephone call to Ms. Aviles concerning additional black venirepersons. Ms. Aviles informed Judge Corrigan that she could provide an additional panel, but she could not guarantee that it would include black persons. Judge Corrigan asked Ms. Aviles to do so. The judge then informed counsel of the situation including the fact that the supplemental panel might not include minority persons.[7]

---

[7] Judge Corrigan stated on the record during the voir dire process in the *Webb* trial: "The next thing they had indicated was that perhaps, as has been done in trial courts, where there's an imbalance as to the percentage of any one race or ethnic group, that additional jurors be added to the panel. I made no count last night, but apparently your counsel did and they indicated to the Court that there were only two blacks on the panel of thirty-six, at which point I called upstairs to find out if there were any additional people who were brought in yesterday and was informed that I had them all except for four people who [had] other things to do this week, so that I was getting all the panel that was coming in yesterday.

"Then I asked the jury clerk if there were any other black jurors up there who came in previously that could be added to the panel and she said there was no way of denoting that and that she didn't want to walk up to any particular black juror and ask them to sit on a particular panel. *So, her only avenue was then to make a selection of an additional number of people, hoping that there would be some black jurors on that additional number.*" (Emphasis added.)

In response to a complaint by the defendant that the venire panel was still underrepresentative, Judge Corrigan explained: "In fact, even that didn't really, in my own mind, have to be done. And I feel that it was a considerable accommodation at your request to attempt to do it. And I grant that the mechanics weren't as efficient as I thought they might be, but on your attorneys' first communication it was my purpose to go out there right then and start and have you make your challenge sometime later because I didn't feel you were entitled. But, on second thought when your attorneys suggested that I call upstairs and find out whether there were black venire people available, I did so. But it was for your accommodation and not for the Court's."

"Judge Corrigan's clerk, Lynne Williams, was then dispatched to the jury assembly room to get the supplemental panel. She observed Ms. Aviles assembling the panel by going to each individual juror rather than the usual procedure of calling the names and having the jurors report to her.

"The supplemental panel consisted of five venirepersons. Two members of the panel, Thomas Dukes and Jean Merrill were black. The supplemental panel was added to the panel which had been brought down for the morning. The voir dire oath was administered and the selection process in the *Webb* case resumed. Jean Merrill was selected for the case, Mr. Dukes was not.

"Although some of the above facts are in dispute, the essential facts are supported by a preponderance of the evidence. What happened was that the jury clerk at the request of the trial judge, in response to a complaint from [the] defendant concerning the racial makeup of the panel assembled a supplemental panel hoping that it would contain [prospective] black jurors. Except for notifying the jurors individually of their assignment to the case the usual procedure before noted was used by the jury clerk.

"This conclusion was confirmed by Judge Corrigan's statement on the record addressed to Mr. Webb after the panel was administered the oath and removed from the courtroom and is supported and not directly contradicted by Ms. Aviles' testimony in 1991. If Ms. Aviles simply desired to accommodate the judge and provide more black venireperson[s] as suggested by Mr. Gold she could have done so by sending black jurors only. This was not done.

"In answer to the specific question of the remand order it is found that additional venirepersons were selected for the case of *State* v. *Daniel Webb*, [supra, Docket] No. CR89 371150, in the hope that it would

make more minority venirepersons available in that case. The selection was not made on a non-random racial basis, however."[8]

The defendant raises two issues in this appeal. He first claims that African-American venirepersons were purposefully directed to the *Webb* trial, thus depriving him of his state and federal constitutional right to a jury selected from a fair cross section of the community.[9] He also claims that the trial court improperly instructed the jury on reasonable doubt and on the presumption of innocence.

## I

The defendant claims that the trial court's finding that the selection of the supplemental panel in the *Webb* case was done in a random manner was clearly erroneous. Because we conclude that the trial court's factual findings were supported by the record, we disagree.

"The Sixth Amendment requires that jury panels be drawn from a source representing a 'fair cross section' of the community in which the defendant is tried. *Taylor* v. *Louisiana*, 419 U.S. 522, 536 [95 S. Ct. 692, 42 L. Ed. 2d 690] (1975); *United States* v. *LaChance*, 788 F.2d 856, 864 (2d Cir.), cert. denied, 479 U.S. 883 [107 S. Ct. 271, 93 L. Ed. 2d 248] (1986). . . . [T]he Sixth Amendment guarantees the *opportunity* for a representative jury venire, not a representative venire itself. *Roman* v. *Abrams*, 822 F.2d 214, 229 (2d Cir. 1987), cert. denied, 489 U.S. 1052 [109 S. Ct. 1311, 103 L. Ed. 2d 580] (1989)." (Citation omitted; emphasis in original.) *United States* v. *Jackman*, 46 F.3d 1240, 1244

---

[8] The trial court also determined that "it cannot be found that the process used in the *Webb* case resulted in fewer minority venirepersons available for the May 17, 1991 panel of venirepersons in the case of *State* v. *Ricky Ellis*."

[9] See footnote 1.

(2d Cir. 1995). In order to guarantee this right, Connecticut adopted General Statutes (Rev. to 1991) § 51-220a,[10] which requires that venire panels be randomly selected.

---

[10] General Statutes (Rev. to 1991) § 51-220a provides: "USE OF ELECTRONIC PROCESSING IN SELECTION AND SUMMONING OF JURORS. (a) (1) Electronic data processing and similar equipment approved by the jury administrator may be used in the selection, drawing and summoning of jurors under this chapter, and in such case the jury administrator shall direct the manner of such use *so as to provide for selection and drawing of jurors at random or by rotation.* At his election, the jury administrator may enter into a computerized data processing file the names of persons selected by jury committees of towns within any judicial district and the names of persons selected from the records of the motor vehicle department pertaining to motor vehicle operators' licenses as provided in section 51-222a, in order to perform the following tasks with the use of equipment, including electronic data processing equipment: (1) The preparation of inquiry blanks returnable to him rather than to the clerks of the superior court; (2) the review of the returned inquiry blanks to sort any persons who are disqualified or exempt from such persons who are not disqualified or exempt; (3) the drawing by lot or by random of the names of jurors to be summoned to any court location and the addressing and mailing of summonses for such jurors; and (4) the furnishing to the clerk of court, where the jurors are summoned to appear, a set of slips containing the names of the jurors, a list in alphabetical order by town and by name within the town of the jurors summoned to appear, and such other documentation as the jury administrator deems feasible.

"(2) This subsection shall apply to jurors selected and summoned to serve on or before August 31, 1986.

"(b) (1) Electronic data processing and similar equipment may be used in the selection, drawing and summoning of jurors under this chapter. At his election, the jury administrator may enter into a computerized data processing file the names of persons selected by jury committees of towns within any judicial district and the names of persons selected from the records of the motor vehicle department pertaining to motor vehicle operators' licenses as provided in section 51-222a, in order to perform the following tasks with the use of equipment, including electronic data processing equipment: (A) The drawing by lot or by random of the names of jurors to be summoned to any court location and the addressing and mailing of summonses for such jurors; and (B) the furnishing to the clerk of court, where the jurors are summoned to appear, a set of slips containing the names of the jurors, a list in alphabetical order by town and by name within the town of the jurors summoned to appear, and such other documentation as the jury administrator deems feasible.

"(2) This subsection shall apply to jurors selected and summoned to serve on or after September 1, 1986." (Emphasis added.)

In order for a defendant successfully to challenge the composition of his jury array, the "defendant must prove that: (1) the group claimed to be excluded is distinctive in the community, (2) the representation of the group in the jury pool is not fair and reasonable in relation to the number of members of the group in the community, and (3) the underrepresentation is the result of systematic exclusion of the group in the jury selection process. *Duren* v. *Missouri*, 439 U.S. 357, 364 [99 S. Ct. 664, 58 L. Ed. 2d 579] (1979)." *United States* v. *Jackman*, supra, 1245–46; see also Practice Book § 842;[11] *State* v. *Castonguay*, 194 Conn. 416, 421, 481 A.2d 56 (1984).[12] Because he has failed to demonstrate that any underrepresentation was "the result of systematic exclusion"; *United States* v. *Jackman*, supra, 1246; the defendant's claim must fail.[13]

Our review of the factual findings of the trial court is limited to a determination of whether they are clearly erroneous. *Adriani* v. *Commission on Human Rights & Opportunities*, 228 Conn. 545, 548, 636 A.2d 1360 (1994); see also Practice Book § 4061. "A finding of fact

[11] Practice Book § 842 provides in relevant part that a party "may challenge an array on the ground that there has been a material departure from the requirements of law governing the selection and summoning of an array. . . ."

[12] Although this court in *State* v. *Castonguay*, supra, 194 Conn. 416, articulated the method for challenging a grand jury array, subsequent cases have considered the method articulated therein equally applicable to the petit jury selection process. See, e.g., *Alexander* v. *Louisiana*, 405 U.S. 625, 626 n.3, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972); *State* v. *Robinson*, 227 Conn. 711, 718, 631 A.2d 288 (1993); *State* v. *Couture*, 218 Conn. 309, 316, 589 A.2d 343 (1991); *State* v. *Nims*, 180 Conn. 589, 597 n.2, 430 A.2d 1306 (1980).

[13] The hearing court's finding that the selection process was random is dispositive of the defendant's claim that the selection process was tainted by purposeful direction of African-Americans to the *Webb* venire. We need not address, therefore, whether a nonrandom selection results in a systematic exclusion. See *Duren* v. *Missouri*, supra, 439 U.S. 364.

is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. *Dalia* v. *Lawrence*, 226 Conn. 51, 71, 627 A.2d 392 (1993), quoting *Inland Wetlands & Watercourses Agency* v. *Landmark Investment Group, Inc.*, 218 Conn. 703, 708, 590 A.2d 968 (1991); *State Medical Society* v. *Commission on Hospitals & Health Care*, 223 Conn. 450, 458, 612 A.2d 1217 (1992)." (Internal quotation marks omitted.) *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 772, 646 A.2d 790 (1994). Nonetheless, because of the constitutional implications of the alleged defect in the jury selection process, we will subject the findings of the trial court to the same "independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . ." *State* v. *Ross*, 230 Conn. 183, 259, 646 A.2d 1318 (1994); see also *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993).

The defendant posits four arguments that the trial court's factual determination that the supplemental venire panel drawn in *Webb* was randomly selected was clearly erroneous.[14] First, the defendant argues that

---

[14] The defendant also argues that because Judge Miano, in *State* v. *Hooks*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 90 394660 (August 9, 1991), dismissed a jury panel because the potentially nonrandom selection of the supplemental venire panel in *Webb* had tainted the venire pool, the hearing court improperly denied him the opportunity to question Judge Miano regarding that dismissal. The defendant, however, makes no effort to connect this ruling to the randomness of the selection process. We note, however, that Judge Miano's decision to dismiss the jury was made without the benefit of testimony or evidence,

because Aviles did not send to the courtroom the supplemental panel for the *Webb* case until after she had told the trial judge of its racial composition, the supplemental panel was not randomly selected. Whether a particular selection is random is determined at the time of the selection, and events occurring after that selection cannot affect its randomness. Thus, the mere fact that Aviles called the trial judge prior to sending him the selected panel could not have altered the randomness of the selection.

Second, along similar lines, the defendant argues that because Judge Corrigan specifically requested more African-Americans for the May 15 panel in *Webb*, the selection process could not have been random. These arguments must fail. Although it may be true that Judge Corrigan asked for additional African-Americans for the supplemental venire panel, this does not translate into a requred finding that the selection of the prospective jurors was accomplished by a nonrandom selection process simply to conform to the court's wishes. There is significant evidence on the record that the jury clerk refused purposefully to direct additional African-Americans to the panel. In addition, Judge Corrigan stated in *Webb* that the only way that he could accommodate the defendant's concerns about the array would be to call for a supplemental panel in the "hope" that it would contain additional African-American persons.

Third, the defendant argues that because the five juror supplemental panel was 40 percent African-American,[15] and the United States 1990 census report indicated that the population of Hartford county was

and without firsthand knowledge of the selection process in *Webb*. *State v. Ellis*, 224 Conn. 711, 717–18, 621 A.2d 250 (1993).

[15] Two of the five jurors on the supplemental panel were African-American.

10.2 percent African-American, the process could not have been random. This argument fails, however, because the fact that the selection process yielded an unlikely result, namely, an unusually high percentage of African-American venirepersons, is not proof that the process was nonrandom. "[R]arity . . . itself shouldn't necessarily be evidence of anything. . . . In some contexts, improbabilities are to be expected." J. Paulos, Innumeracy—Mathematical Illiteracy and Its Consequences (1988) p. 40. Indeed, "it would be very unlikely for unlikely events not to occur." Id., p. 28. The defendant has not demonstrated by the occurrence of an unlikely result that the selection process was nonrandom.

Finally, the defendant argues that Aviles' testimony in a hearing in the case of *State* v. *Kendall C.*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR 89 375242 (May 31, 1991), demonstrates that the selection of the supplemental panel was nonrandom.[16] At this hearing, held two weeks after the selection of the venire pool in *Webb*, Aviles testified that she may have deviated from the procedure she used in other cases.[17] At the remand hearing ordered by this court, held more than two years after the *Kendall C.* hearing, Aviles testified that, although she could not specifically remember what she had done in selecting the supplemental panel in *Webb*, she would not have deviated from her usual procedure. Despite the apparent inconsistencies in Aviles' testi-

[16] Kendall C. was the defendant in the May, 1991 case in which Judge Purtill held an evidentiary hearing to determine whether there had been deliberate racial stacking of the *Webb* jury panel. See *State* v. *Ellis*, 224 Conn. 711, 718 n.3, 621 A.2d 250 (1993).

[17] Specifically, Aviles testified as follows:

"Q. So when you indicated that the procedure that you use in all cases yesterday when you testified, that's not the way it was done in the Webb case?

"A. No. Well, yes and no."

mony, we are not persuaded from the record that the procedure that she used in selecting the supplemental panel was not random. The trial court reasonably could have found from the evidence that Aviles' only deviation from her usual procedure was that she approached the individual venirepersons whom she had randomly selected and inquired whether they already had been called for the *Webb* case. Although the record is not explicit as to why Aviles deviated from her routine, it was reasonable for the trial court to have drawn the inference that she saw no purpose in sending up venirepersons who had already been rejected. Nothing in the record indicates that her actions had any effect on the randomness of the selection.[18]

We are unpersuaded that the defendant's arguments, individually or collectively, demonstrate that the trial court's finding was not supported by the record. The defendant has failed to direct our attention to any fact or portion of the record, nor have we discovered any, that demonstrates that the trial court was clearly erroneous in finding that the supplemental panel in *Webb* had been randomly selected.

## II

We next consider whether the trial court properly instructed the jury on reasonable doubt and the pre-

---

[18] The defendant further argues that because the state failed to call the state's attorneys who were present during the chambers conference with Judge Corrigan, we should infer that the testimony of these attorneys would have been adverse to the state. See *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). Because the defendant has failed to specify how any inference drawn from the state's failure to call the two prosecutors would implicate the randomness of the supplemental selection process, we decline to address this argument.

The defendant also argues that the trial court improperly prohibited him from asking Judge Corrigan what he would have done if the supplemental panel he had requested for the *Webb* case had not included any African-Americans. Because we conclude that any testimony in this regard would have been irrelevant to the defendant's underlying claim that the selection process was nonrandom, we decline to address this argument.

sumption of innocence. The defendant argues that the trial court's instruction reduced the state's burden of proof or shifted that burden to the accused in violation of his federal and state constitutional rights to due process and a jury trial.[19] We disagree.

Specifically, the defendant challenges the following sentence from the jury instructions: "A reasonable doubt is a doubt for which a valid reason can be assigned. . . . It is . . . such a doubt as in the serious affairs which concern you in your everyday life you would pay some strict attention to." We have repeatedly and consistently upheld identical or substantially similar instructions on reasonable doubt. See, e.g., *State* v. *Williams*, 231 Conn. 235, 254 n.22, 645 A.2d 999 (1994); *State* v. *Gomez*, 225 Conn. 347, 353, 622 A.2d 1014 (1993), and cases cited therein. "In our previous cases, we concluded that this instruction did not decrease the state's burden of proof when viewed in the context of the charge as a whole. . . . In this case, the jury charge, taken as a whole, presents an accurate definition of proof beyond a reasonable doubt." (Citation omitted.) *State* v. *Williams*, supra, 254 n.22. The defendant has provided no compelling reason to depart from this long line of precedent and we therefore decline to do so.

The defendant also challenges the trial court's instructional caveat that "you must keep in mind that those rules were made to protect the innocent and not the guilty."[20] Here again, the challenged language is

---

[19] The defendant cites to amendments five, six and fourteen to the United States constitution, and article first, §§ 8 and 19, of the Connecticut constitution. The defendant has not provided an independent analysis of the state constitutional issues and therefore we decline to review the jury challenges under the state constitution. See footnote 1.

[20] The challenged language—"But you must keep in mind that those rules were made to protect the innocent and not the guilty"—is immediately preceded by language emphasizing that "it is the strong duty of courts and jurors to safeguard the rights of person[s] charged with crimes by respect-

identical or substantially similar to language we have recently upheld. "Identical challenges were recently resolved against defendants in *State* v. *Walton*, [227 Conn. 32, 66–67, 630 A.2d 990 (1993)], *State* v. *Tucker*, 226 Conn. 618, 651–52, 629 A.2d 1067 (1993), and *State* v. *Stanley*, 223 Conn. 674, 695–96, 613 A.2d 788 (1992). Our recent line of cases is dispositive. Those instructions, and any deviation from the previously approved language of those instructions did not, when viewed in the context of the entire charge, dilute the defendants presumption of innocence or lessen the state's burden of proof . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 135, 635 A.2d 762 (1993).

We conclude that the trial court's charge, when taken in its entirety, was sufficient to inform the jury that the defendant was entitled to a presumption of innocence unless and until the state proved him guilty and that it was the state's burden to prove him guilty beyond a reasonable doubt. The trial court's instructions were not constitutionally infirm.

The judgment is affirmed.

In this opinion the other justices concurred.

---

ing a presumption of innocence which the law gives . . . every person so charged [b]y making the State meet its burden of proving its charges beyond a reasonable doubt." The challenged language is immediately followed by language instructing the jury that "[i]f and when the presumption of innocence is overcome by evidence, proving beyond a reasonable doubt that the accused is guilty of the crime charged, then it is your sworn duty to enforce the law and render a verdict of guilty." We do not believe that a reasonable juror could have been misled by this instruction. We note that the trial court in *Ellis* gave this instruction without the benefit of our suggestion enunciated in *State* v. *Francis*, 228 Conn. 118, 136 n.19, 635 A.2d 762 (1993), that: "(1) the challenged sentence be omitted; or (2) it be modified to provide as follows: 'But the law is made to protect society and persons whose guilt has not been established beyond a reasonable doubt, and not to protect those whose guilt has been so established.' "