[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a habeas petition initially filed on January 18, 1990. By Amended Petition dated October 6, 1996, the petitioner claims that his confinement to the custody of the Commissioner of Corrections in unlawful on the basis of his assertion that he was denied the effective assistance of trial and appellate counsel in the underlying criminal proceedings. Based on the evidence adduced at the hearing, the court makes the following findings and ruling.
On September 19, 1989, following a jury trial in the Superior Court, Hartford Judicial District in Docket No. 53889, the petitioner was found guilty of Kidnaping in the First Degree in violation of Connecticut General Statute 53a-92 (a)(2)(B), Sexual Assault in the First Degree in violation of C.G.S. 53a-70 (a), Robbery in the Third Degree in violation of C.G.S. 53a-136 (a), Assault in the Third Degree in violation of C.G.S. 53a-61 (a)(1), and Larceny in the Second Degree in violation of C.G.S. 53a-123
(a)(3).
On October 26, 1989, the petitioner was sentenced to a total effective sentence of forty-five years confinement in the custody of the Commissioner of Corrections. The petitioner is currently an inmate serving the imposed sentence.
At trial, the petitioner was represented by Assistant Public Defender Christopher Cosgrove. The State was represented by Assistant State's Attorney Edward Narus. The trial judge was the Honorable Thomas H. Corrigan.
The petitioner's conviction was affirmed on appeal. State v.Tillman, 220 Conn. 487 (1991), cert. denied, 505 U.S. 1207,112 S.Ct. 3000 (1992). The petitioner was represented on appeal by Special Public Defender Charles D. Ray.
While the details of the underlying events are reported in CT Page 6609 the Connecticut Supreme Court opinion, some recitation of the facts is useful for the court's consideration of the petitioner's claims. At trial, the State introduced evidence that in the late evening hours of January 21, 1988, as the victim was preparing to start her car and depart a parking lot on Columbus Avenue in Hartford, the petitioner forced his way into the car, and thereafter assaulted her. The State also adduced evidence that, in the course of these assaults, the petitioner drove the victim's car from one place to another with the victim in the car, and that he stole various items of value from her before finally leaving the car and fleeing with the victim's purse. Through medical, hospital, and police witnesses, the State offered evidence to corroborate the victim's testimony that she had, indeed, been sexually and physically assaulted, and that she had identified the petitioner as the perpetrator from police photographs shortly after the attack.
The Amended Petition contains two counts concerning the effectiveness of trial counsel. In Count One, the petitioner alleges that counsel failed to present the testimony of the Hartford Judicial District Jury Clerk, Ruth Kviesis in regard to his request to the court for a new supplemental jury panel, and that he failed to request an evidentiary hearing to support his claims of unconstitutional jury selection methods, or to request a continuance to gather evidence probative to such a claim. In Count Two, the petitioner asserts that trial counsel failed to lay a proper foundation for the admissibility of the field notes of a trial witness, which notes could have been used to impeach the testimony of another trial witness regarding fingerprint evidence. As the petitioner presented no evidence at the habeas hearing in support of the allegations contained in Count Two, the court views this claim as not proven. In Count Three, the petitioner claims that appellate counsel was deficient on the basis that he failed, in his brief, to argue that the trial court should have held a hearing, sua sponte, concerning the composition of the jury array.
The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352 (1989). Competent representation is not to be equated with perfection. CT Page 6610 "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v.Commissioner, 36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy' . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted.) Strickland v.Washington, supra, 466 U.S. 689-90; Quintana v. Warden,220 Conn. 1 (1991); Williams v. Warden, 217 Conn. 419 (1991); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
With respect to the prejudice component of the Strickland
test, the petitioner must demonstrate that, ". . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v.Washington, supra 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a CT Page 6611 successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland v. Washington, supra 466 U.S. 694. "`When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"Fair v. Warden, 211 Conn. 398, 408 (1989); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
For reasons that are relevant to this petition, the court notes that the petitioner, by racial composition, is African-American and Native-American. The court also notes that the victim of the petitioner's offenses is a white female. Finally, with respect to the context of the petitioner's claims, the court notes that prior to the petitioner's trial there had been considerable newspaper coverage of an assault on August 24, 1989 by an African-American male, Daniel Webb, upon a white female resulting in her death. cf. State v. Webb, 238 Conn. 38
(1996). Broad news coverage of the details of the Webb assault heightened the petitioner's concerns in regard to the racial composition of the jury panel available to serve as the petit jury in his case.
With respect to the allegations concerning the composition of the jury panels, the court notes that jury selection in the underlying criminal trial commenced on September 5, 1989. On that date, the panel consisted of fifteen people, two of whom were African-American females. The first venire person called for voir dire examination was an African-American female who was excused by the defense. The second venire person was an African-American female excused by the State. The third venire person, a white male, was accepted by both sides, as was the fourth venire person, a white female. The fifth and sixth venire persons, both white females, were excused by the defense. The seventh venire person was seated as a juror member. While a reading of the transcript does not reveal this man's racial identity, it appears from his name as well as questions relating to family members of Puerto Rican descent and inquiries regarding his view of Puerto Rican male attitudes toward women, that he was of Hispanic origin. The next venire person, number eight, a white male, was excused by the defense. Venire person number nine, a white female, was seated on the jury. Venire person number ten, a white CT Page 6612 male, was excused by the defense, while the next venire person, a white female, was excused by the court. Venire person number twelve, a white male, was seated, while venire person thirteen, a white female, was excused by the court. Prospective juror number fourteen was accepted, and the last person in this panel, a white female, was excused by the defense. At this point, therefore, from the first panel of fifteen venire persons, six jurors were selected, the defense exercised six peremptory challenges, the State had used one, and the court had excused two prospective jurors for cause.
When eleven more venire persons were brought from the jury assembly room for voir dire examination, Attorney Cosgrove raised, as an issue with the court, that the first twenty five individuals available for consideration as jurors did not include any black males, and included only one Hartford resident. Counsel made no request for a hearing in this regard.
Thereafter, jury selection continued. Venire person number sixteen, a white male, was excused by the defendant, while the next two prospective jurors, both white females, were excused by the court. Venire person number nineteen, a white male, was accepted, and became the first alternate.
Jury selection continued on September 11, 1989. At the beginning of the process, before the next prospective juror was summoned to the court room, Attorney Cosgrove read a statement prepared by the petitioner into the record. In his statement, the petitioner noted that there were only two black individuals, and just one Hartford resident, out of twenty-four individuals summoned for voir dire examination. In his statement, the petitioner objected to the jury array. Counsel also reported the substance of his conversation with Ruth Kviesis to the court, stating that Ms. Kviesis had informed him that people who were not paid by their employers for jury service were typically excused, upon request, from jury service. He also reported that Ms. Kveisis had indicated her belief to him that often minority members were employed by such employers. While reporting this conversation and reading the petitioner's statement into the record, counsel noted that he was not personally endorsing the petitioner's claims regarding the jury array. He stated, in fact, that he had personal knowledge that in another criminal trial taking place simultaneously in an adjacent courtroom, the panel for that trial contained five African-Americans, three of whom had been selected for jury service. He represented to the court CT Page 6613 that he was not making a Batson claim on behalf of the petitioner. cf. Batson v. Kentucky, 476 U.S. 79 (1986).
In response to counsel's comments and the petitioner's statement, the court noted that the objection to the jury array had been made following selection of six jurors, and only once the second panel had been brought down for voir dire examination.
Thereafter, the voir dire continued. Venire person number 20, a white female, was excused by the defense in the exercise of it's eighth and last peremptory challenge. The next prospective juror, a white male, was seated as the second alternate.
In his questioning of venire persons, defense counsel invariably raised the issue of race to inquire whether the prospective juror could be fair and impartial. Additionally, counsel inquired of most prospective jurors whether they had read or heard about the Webb assault, and counsel asked further questions to assess whether the prospective jurors had been tainted by the Webb publicity.
On the date of sentencing, Attorney Cosgrove argued a Motion for Acquittal and a Motion for a New Trial. His latter motion included allegations relating to the composition of the trial jury, and specifically that the panels from which the jury members were selected included no black males and only one Hartford resident. The motions were denied.
The petitioner is correct in his allegation that Attorney Cosgrove failed to seek an evidentiary hearing concerning the jury array. Practice Book 842 provides that:
"Any party may challenge an array on the ground that there has been a material departure from the requirements of law governing the selection and summoning of an array. Such challenge shall be made within five days after notification of the hearing or trial date, unless the defect claimed has arisen subsequent to the time required to make such motion." Commenting on this section in the petitioner's direct appeal, and noting that defense suspicions that black males or Hartford residents were being systematically excluded only arose after the second panel had been summoned, the court stated, "Where a constitutional flaw is discovered and brought to the court's attention before jury selection is complete, and good cause can be shown for the defendant's failure to mount an earlier challenge, the Practice CT Page 6614 Book is not a procedural roadblock." State v. Tillman, supra,220 Conn. 494. Since jury selection had not been completed at the time the second panel was summoned, counsel could still have mounted a challenge to the array.
In 1995, the Connecticut Supreme Court commented on the constitutional parameters of the right to a jury of one's peers. The court stated, "The Sixth Amendment requires that the jury panels be drawn from a source representing a fair cross section' of the community in which the defendant is tried. Taylor v. Louisiana, 419 U.S. 522, 536 [95 S.Ct. 692, 42 L.Ed.2d 83] (1975); United States v. LaChance, 788 F.2d 856, 864 (2nd Cir.), cert. denied, 479 U.S. 883, [107 S.Ct. 271, 93 L.Ed.2d 248] (1986). . . . [T]he Sixth Amendment guarantees the opportunity for a representative jury venire, not a representative venire itself. Roman v. Abrams, 822 F.2d 214, 229 (2nd Cir. 1987), cert. denied, 489 U.S. 1052 [109 S.Ct. 1311, 103 L.Ed.2d 580] (1989)." (Citation omitted.) United States v. Jackman, Docket No. 93-1868, slip op., pp. 1241-42 (2nd Cir. January 17, 1995)." State v.Ellis. 232 Conn. 691 (1995).
In order to demonstrate that this right has been violated, one challenging the jury array must show, (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and, (3) that this under representation is due to systematic exclusion of the group in the jury-selection process. Id.; State v. Tillman, supra,220 Conn. 492. In Thiel v. Southern Pacific Co., 328 U.S. 217, 221 (1946), the United States Supreme Court opined, "The choice of the means by which unlawful distinctions and discriminations are to be avoided rests largely in the sound discretion of the trial courts and their officers. This discretion, of course, must be guided by pertinent statutory provisions."
The petitioner makes no allegation that the State's statutory scheme for selecting and summoning venires is impermissible. Rather, his claims focus on the practices of the Hartford J.D. jury clerk in granting excuses to individuals who sought relief from jury service.
At the habeas hearing, the petitioner called Ruth Kviesis. Ms. Kviesis testified that she has been the jury clerk at the Hartford Judicial District Superior Court for approximately ten CT Page 6615 years. Thus, she held this position in 1989 during the petitioner's trial. During 1989, potential jurors were summoned to court for a four week period of service. A new group was summoned approximately once each two weeks. At the time, jurors received compensation at the daily rate of ten ($10) dollars plus mileage reimbursement.
From documentary evidence adduced at the hearing, the court notes that three hundred sixty (360) individuals were summoned to appear for jury service at the Hartford Judicial District on August 15, 1989, and another three hundred sixty (360) for August 29, 1989. These individuals constituted the universe from which the petitioner's jury was selected.
The petitioner has made no claim that the geographic distribution of the venire person's listed was impermissibly disproportionate. Nor did he introduce any census information at the hearing to show the populations of the various municipalities from which potential jurors were drawn. The court notes that individuals from twenty eight (28) communities were summoned for jury service in August, 1989. For the August 15, 1989 list, this included fifty eight (58) Hartford residents; for the August 29, 1989 list, sixty (60) Hartford residents were summoned.
Ms. Kviesis testified that in 1989, jurors summoned for service who wished to be excused generally wrote letters stating their reasons. She and an associate, Diana Aveles, reviewed the excuse letters. If the letter was self explanatory, and presented sufficient reason for excusing the juror, Ms. Kviesis excused the person from attendance. In some instances, the juror seeking an excuse was asked to submit further documentation. Individual decisions made by Ms. Kviesis or Ms. Aveles were not reviewed by the court.
While Ms. Kviesis and Ms. Aveles marked the juror listings for August 15th and August 29th with code words for excuses, evidence adduced at the hearing supports the conclusion that individuals who requested relief from service for the following reasons were among those excused: (1) those who indicated that it would be very difficult to be away from their employment for an entire month. This group included those working in small offices, or for small companies, teachers, and medical personnel; (2) those who requested relief on the basis that they would not be compensated by their employers during the period of jury service. Ms. Kviesis considered individuals in this category to have an CT Page 6616 economic hardship; (3) those who were self employed, or working on commission, and who indicated that service for a month would present an undue hardship. These, too, were considered to have an economic hardship; (4) those for whom service would present a medical hardship; (5) college students who were not physically available to serve; (6) individuals whose child care responsibilities made them unavailable; (7) those with planned vacations; (8) those who have moved out of the jurisdiction; (9) those who did not have transportation to reach the courthouse. Some individuals who said they did not have private transportation, but who lived sufficiently near public transportation, were instructed to utilize public transportation. The elderly who indicated they had no means of transportation were excused; (10) those who were over a certain age and asked to be excused; (11) those who did not speak English, or who said they were incapacitated by reason of blindness or deafness; (12) those whose religious beliefs prevented them from judging others.
Records of individuals summoned for jury service, including those who were excused, did not contain any racially identifying notations. Notwithstanding this lack of data concerning the racial composition of excused jurors, Ms. Kviesis proffered an opinion to Attorney Cosgrove during jury selection, and to this court during the habeas hearing, that many more minorities than others were excused from service. She based this opinion on her belief that minorities were more likely to occupy lower and hourly pay employment positions where they would probably not receive compensation for time spent in jury service. Ms. Kviesis acknowledged that this belief is based on her assumption alone. It is not a speculation upon which this court will make any factual finding concerning the racial identity of individuals excused from jury service during the relevant time period in 1989.
With respect to the claim of economic disparity, it appears from a review of the excuses granted that the reasons proffered by jurors seeking relief from service ranged the gamut from economic hardship to inconvenience based on prior vacation plans. More directly, those excuses characterized by Ms. Kviesis as based on economic hardship included self employed retailers and commissioned salespersons as well as employees who indicated they would not be paid during jury service. On the basis of this evidence, the court finds that the petitioner has failed to demonstrate that the excuses given by Ms. Kviesis and Ms. Aveles resulted in a disproportionate amount of minority venire persons, CT Page 6617 or a disproportionate lack of low income venires. The court is unpersuaded that a hearing to adduce this information before the trial judge would have resulted in any alteration to the jury-selection process in the petitioner's trial.
With respect to the claim that there was only one Hartford resident on the two panels from which his jury was selected, a review of the list of jurors summoned does not support a factual finding that a disproportionately low number of Hartford residents were summoned, or that a disproportionate number of Hartford residents were excused from service for inappropriate reasons. While the absence of Hartford residents, and the presence of two African-Americans, on the two venire panels may have been an unfortunate luck of the draw, the petitioner has no constitutional entitlement to geographically or racially proportionate representation on the petit jury itself.
The petitioner also claims that the practice by Ms. Kviesis and Ms. Aveles of granting excuses without particularized judicial approbation was unlawful. C.G.S. 51-10 provides, in part, that, "The Chief Court Administrator . . . shall appoint and fix the compensation of a Jury Administrator and such other assistants are necessary to enable the Jury Administrator to perform the duties of his office." C.G.S. 51-219a, concerning the duties of the Jury Administrator, provides that the Jury Administrator shall be subject to supervision by the Chief Court Administrator, and, ". . . shall be responsible for the design, implementation and maintenance of a computerized electronic data processing system for qualifying, summoning, selecting, managing and utilizing jurors in the Superior Court." This Statute provides additionally that, "The Jury Administrator, subject to the approval of the Chief Court Administrator, shall have the authority to study and to implement procedures for the improvement of jury administration, for the reduction of costs of selection and management of jurors, and for the more effective utilization of jurors." Also of relevance to this discussion is C.G.S. 51-231, concerning the drawing of jurors, which provides, in part, that, "Before or during each jury session of the superior court in each judicial district, the clerk or an assistant clerk of the superior court shall publicly, randomly or by rotation, draw the names of as many jurors from the judicial districts as are ordered to attend said court by the judges assigned to such jury session, which names shall constitute a singly jury panel for criminal and civil sessions at any court location within the judicial district. The clerk or an assistant CT Page 6618 clerk of the court, upon direction of any judge of said court, may assign any jurors of the panel to attend any courtroom within the judicial district." The parameters for jury eligibility and jury service are set forth in Chapter 884 of the Connecticut General Statutes. While paragraph (a) of C.G.S. 51-217 sets forth the general eligibility requirements for jury service, part (b) of the statute provides that, "The jury Administrator may determine, in such manner and at such times as he deems feasible, whether any person is qualified to serve as juror under this section and whether any person may be excused for extreme hardship. Additionally, C.G.S. 51-217a provides, in pertinent part that, ". . . (b) The court shall have authority to excuse a juror from juror service, upon a finding of extreme hardship. " Nowhere in this statutory scheme is found the requirement that the Jury Administrator or the court must personally determine each excuse. During the habeas hearing, the petitioner adduced no evidence that, in passing on excuse requests, Ms. Kviesis or Ms. Aveles were acting beyond the scope of their authority. A reasonable understanding of the legislation, coupled with the absence of evidence to the contrary, leads the court to the belief that Ms. Kviesis and Ms. Aveles were acting under the general direction and pursuant to the authority granted to the Jury Administrator and the court in determining whether to excuse jurors for whom service would present an extreme hardship. Even if, arguendo, the court accepted the petitioner's assertion that the jury clerks acted without authority in providing jury excuses, the petitioner has failed to prove that the process resulted in a violation of his constitutional right to a jury comprised of a fair cross section of the community.
In his third count, the petitioner alleges that appellate counsel was ineffective for failing to claim on appeal that the trial court was constitutionally obligated to initiate an evidentiary hearing into possible unconstitutional jury selection methods even though no such hearing was requested by trial counsel. From the evidence, the court agrees with the petitioner that appellate counsel did not raise this issue in his initial brief. During the habeas hearing, Attorney Ray indicated that he first raised this issue, after the filing of briefs, on a motion to reconsider, and he acknowledged that the Appellate Court has frequently refused to consider arguments advanced after the briefs have been filed, even if they involve matters of a constitutional magnitude.
The short answer to this claim is that the petitioner is CT Page 6619 erroneous in his assertion that the trial court was obligated to conduct a hearing on the facts presented by trial counsel. As noted, a review of the trial transcript reveals that on September 6, 1989, Attorney Cosgrove commented to the court that from the two panels consisting of twenty-five individuals, there were no African-American males, and just one Hartford resident. He stated, "I don't know if that's representative of the entire jury pool here but I don't think it comports with Mr. Tillman's right to a trial by a jury of his peers. . . . I just would request the court to ask the jury clerk to send a new panel down here that might be more representative of Mr. Tillman's race and place of residence." Petitioner's Exhibit 2, Excerpt from Trial Transcript, 357. Following a colloquy with the court in which Judge Corrigan suggested that counsel review the law concerning challenges to the array, and indicated that counsel's timing was improper, ". . . . unless you have evidence that the jury clerk is calling in people improperly or excusing them improperly or sending them down other than randomly. . . .", counsel indicated to the court that he had no such evidence and that his comments were merely observations for the record, and that he would make further inquiry of the jury clerk. Id. 357-358. Subsequently, on September 11, 1989, Attorney Cosgrove read into the record a statement prepared by the petitioner concerning the racial composition of the jury array. In this statement, the petitioner alerted the court to his concern that it was going to be impossible for him to have a fair trial. He objected to the jury array and stated that the jury did not consist of his peers. He commented that there were only two black venire persons on the two panels from which his jury had been selected, noting his belief that such representation did not comply with the statistical percentage of African-Americans for the venue. He stated, "I therefore state for the record at this time, I would like to challenge the jury array and ask the court to order whatever is necessary for me to do this." Petitioner's Exhibit 3, Excerpt from Trial Transcript, September 11, 1989, 10. In this statement, the petitioner noted his particular concern based on the substantial newspaper coverage of the Webb story.
Following his recitation of the petitioner's statement, Attorney Cosgrove indicated to the court that he had spoken to Ruth Kviesis, the jury clerk, concerning the method utilized in impaneling juries for use in Hartford J.D. trials. He indicated that the clerk had told him that prospective jurors were being excused, upon request, for economic reasons. He made particular note of information he had received from Ms. Kviesis that CT Page 6620 individuals who would not receive wages from their employers were being excused on the basis of an economic hardship. Attorney Cosgrove commented, "Now I would submit that there is no — that this is not to be construed, and I'm not so doing, it's not to be construed as racial discrimination as such, but the fact is, according to the jury clerk here, that very often members of minorities are employed by employers who do not make up the difference in the ten dollar a day — the difference from the ten dollar a day that the state pays the jurors. Therefore, the clerk agreed that there are a disproportionate number of minorities who would be excluded solely by the jury clerk for this economic hardship. She told me, in fact, that on this particular panel, the array that is available upstairs, that in fact there are not many black jurors available. But I would just note for the court that there is a trial being conducted in the courtroom right adjacent to ours with Judge Quinn, it is captioned State versus Bewry; it involves a murder charge, Your Honor, so they are selecting twelve jurors. I believe they've already begun — they've already completed their selection. But I would note that their panels did include five black people and they, in fact, selected three black people for the jury. Again, the demographics that we have seen for our panel have included two black people, both women, neither of whom was chosen; to be sure, defense excluded one of those and the state excluded the other. I'm not implying anything in the nature of a Batson challenge here, Your Honor, nothing discriminatory. But the simple fact is we have not had an array that has been representative to my client's satisfaction of racial composition of this area as a whole. And as a matter of fact, we have had no black males to choose from whatsoever. So he did want that on the record, Your Honor, and I am stating that for the record and to reiterate my objection to the makeup of the panels." Id. 10-12. Following a brief colloquy, the court noted, "I should note as well that six jurors were selected prior to the challenge having been made." Id 13-14. To this, counsel replied, "Yes, Your Honor. The challenge initially came about because when the second panel came in there were no blacks on it. The first panel did include two blacks and one Hartford resident. The second panel had no blacks or Hartford residents." Id. 14.
On the basis of these allegations, the court was under no obligation to conduct a hearing sua sponte on the jury array. To the contrary, by acknowledging the presence of African-Americans on a jury in process in an adjacent courtroom, and by failing to substantiate the petitioner's claims of disproportionality with CT Page 6621 any supportive factual allegations, counsel met his professional obligation to the petitioner to make his concerns known to the court while contemporaneously, and candidly, providing the court with information contrary to his main assertion. Unlike the situation found by the Supreme Court in State v. Brown,235 Conn. 502 (1995), speculation by Ms. Kviesis concerning the racial composition of excused venire persons did not constitute a fact-laden allegation of jury misconduct which would have required the court to conduct an inquiry in order to secure the promise of an impartial jury. The court is unpersuaded that appellate counsel would have been successful even if he had included in his initial brief a claim that the court should have conducted a hearing when notified of the petitioner's dissatisfaction with the array. The facts alleged, viewed in their entirety, were insufficient to trigger an obligation on the court to conduct a hearing, sua sponte, concerning the jury array.
For the reasons stated, the petition is dismissed.
Bishop, J.