# STATE OF CONNECTICUT *v.* ROBIN ELLIOTT
## (14807)

O'Connell, Foti and Heiman, Js.

Argued September 14—decision released December 12, 1995

*Vicki H. Hutchinson,* for the appellant (defendant).

*Ronald G. Weller*, deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Patricia M. Gilbert*, assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of assault of an employee of the department of correction in violation of General Statutes § 53a-167c (a) (1),[1] unlawful restraint in the first degree in violation of General Statutes § 53a-95,[2] attempted escape in the first degree in violation of General Statutes §§ 53a-49 and 53a-169,[3] possession of a weapon or dangerous instrument in a correctional institution in violation of General Statutes § 53a-174a,[4] and assault in the second degree in violation of General Statutes § 53a-60 (a) (1).[5] The jury thereafter convicted

---

[1] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of . . . an . . . employee of the department of correction . . . when, with intent to prevent a reasonably identifiable . . . employee . . . from performing his duty, and while such . . . employee . . . is acting in the performance of his duties, (1) he causes physical injury to such . . . employee . . . ."

[2] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-169 (a) provides in relevant part: "A person is guilty of escape in the first degree (1) if he escapes from a correctional institution . . . ."

[4] General Statutes § 53a-174a (a) provides in relevant part: "A person is guilty of possession of a weapon or dangerous instrument in a correctional institution when, being an inmate of such institution, he knowingly . . . has in his possession or under his control any . . . dangerous instrument . . . ."

[5] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . ."

the defendant of being a persistent serious felony offender in violation of General Statutes § 53a-40 (b). The court sentenced the defendant to a total effective term of imprisonment of seventy years. The defendant claims that the trial court improperly (1) instructed the jury on the affirmative defense of mental disease or defect and (2) denied the defendant's motion for a new trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In June, 1993, the defendant was incarcerated at the community correctional center in Newtown and assigned as an inmate to the delta housing unit, cell D-116. The delta unit consists of upper and lower tiers of cells for the inmates. Cell D-116 is located on the lower tier. The lower tier also contains a dayroom with a table and chairs, a control station, a multipurpose room and a recreation yard. The delta unit is capable of housing a total of ninety-six inmates.

On June 5, 1993, at approximately 9 p.m., the inmates on the upper tier were out of their cells for recreation, while those on the lower tier, including the defendant, remained in their cells. Correction Officers Eric Williams and Sheri Privott were on duty as housing officers in the delta unit. At approximately 9:30 p.m., while Privott was engaged in a conversation outside of cell D-101 with the upper tier inmates, who were at recreation, Williams left to make a tour of the unit, leaving the control station unsupervised. At some point after Williams departed for his tour, but before he returned to the control station, someone opened the door of cell D-116, releasing the defendant.

When Williams completed his tour, he returned to the control station to record the unit tour in a logbook. At that time, the defendant approached Williams from behind, struck him over the head with a weight bar, and rendered him unconscious. The defendant then

approached Privott, pushed her from behind into cell D-101 and locked the cell door. She then began to bang on the cell door, asking inmates to let her out. From the cell door window, Privott witnessed the defendant, wearing a clean prison uniform, pass cell D-101 holding prison keys and walk toward the recreation area. The defendant went into the recreation yard, removed a sewer manhole cover, and attempted to escape through the sewer. The pipe, however, was too small for the defendant to pass through and was filled with water.

Shortly thereafter, the defendant returned to open cell D-101 with the prison keys. Privott observed that the defendant's prison uniform was wet and dirty. The defendant began yelling at Privott, backing her up to a chair in the cell and telling her to sit down. Privott complied and the defendant again left, locking the cell door. At approximately 10:30 p.m., the defendant dragged Williams, who remained unconscious, to cell D-116 and once more returned to cell D-101. The defendant opened the door to cell D-101, grabbed Privott by the collar and forced her to go to the control station where he seized a clipboard.

At that point, the defendant forced Privott up the stairs toward the upper tier. The defendant then broke the clipboard over the staircase railing and held a piece of metal from the broken clipboard to her throat. The defendant shouted to the correction officers who had gathered in the sally port[6] to retreat, threatening to kill Privott if they did not. All of the correction officers who had entered the unit at this time complied with the defendant's order.

Captain Dennis Shipman, however, remained in the sally port. The defendant stated to Shipman, "I tried

---

[6] The sally port is located on the upper tier and consists of two large steel doors, one to the housing unit, the other to an outside corridor. To enter the unit, a corridor officer opens the door to the corridor, allowing entrance

to escape. I fucked up." Thereafter, Lieutenant Sean Sullivan entered the sally port where the defendant was still holding Privott hostage, continuing to threaten her life with the piece of metal. The defendant opened the door to the delta unit and allowed Sullivan to enter the unit. He then told Sullivan that he had hit Williams over the head with the metal weight bar, locked Privott in a cell, and tried to escape through the sewer drain. While continuing to hold Privott, the defendant went with Sullivan to cell D-116 and gave up the cell keys. Sullivan unlocked the cell and assisted Williams, who was bleeding from the head, back to the sally port. Eventually, the defendant released Privott and surrendered. Williams suffered a concussion, and ear and scalp lacerations as a result of the assault.

On the third day of trial, after the state had presented four witnesses, the defendant filed his notice of defense of mental disease or defect, and notice of intent to introduce expert testimony. In its charge, the trial court instructed the jury on the affirmative defense of mental disease or defect. The defendant did not object to the charge, nor does he raise any issue concerning that charge on appeal. The defendant claims, however, that, because of an improper supplemental charge, he was deprived of a fair and impartial trial in violation of his rights under article first, § 8, of the Connecticut constitution,[7] and the sixth and fourteenth amendments to the United States constitution.[8]

to the sally port from the corridor. That door is then closed, and the corridor officer opens the door to the housing unit.

[7] Because the defendant failed to present separate and independent analysis of his state constitutional claim, or even to argue that his rights under the state constitution are different or greater than under the federal constitution, he is not entitled to review on that basis. State v. Steiger, 218 Conn. 349, 358 n.9, 590 A.2d 408 (1991); State v. Parsons, 28 Conn. App. 91, 97 n.3, 612 A.2d 73, cert. denied, 223 Conn. 920, 614 A.2d 829 (1992).

[8] The sixth amendment to the United States constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

The supplemental charge objected to by the defendant arose from a jury deadlock. During jury deliberations, the court received a note from the jury and responded as follows: "Record may note the presence of the jurors. I've received your note—the latest note which says, 'Dear Sir, we are deadlocked on the affirmative defense for two of the charges. What should we do?'

"First of all, interpreting that note, I would assume that the—what you've done is there are five charges pending and including, actually, a lesser-included offense as to one of them, but there are basically five charges in the information. I would assume at this point you have found him not guilty on three charges and that you have found him guilty on two others because obviously he—the affirmative defense either applies to all or not. In other words, you either are incompetent to do—in this particular case, since they all arose out of the same event, it would be, in the court's mind, rather impossible to say that at one minute, he was competent, the next minute, he was incompetent, so to speak, to perform these under the affirmative defense.

"So, I can only understand this note, and if I—this is incorrect, then you should resolve that among yourselves. I—I'm not suggesting that. But, basically, what I assume is that at this point, you found him—that the state has—has prevailed in proving him guilty beyond a reasonable doubt as to two of the charges and as—and that you found him not guilty on the remaining charges, whatever they may be.

"With that—if that is correct, I do have what is known as the Chip Smith charge which talks about—

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

"[First Juror]: Excuse me, sir, that's not correct.

"[Second Juror]: That's not correct.

"The Court: All right. Well, then . . . I don't want to get into this because you have to deliberate.

"[First Juror]: Right.

"The Court: But, my point is that you can't—

"[First Juror]: Yeah.

"The Court:—you either are competent or incompetent—

"[First Juror]: Yeah.

"The Court:—at—at one time. You—you can't—I can't—I can't conceive of any time within the short period of time that we are dealing with where you would sort of go in and out of—of being—of having a defect so that—that you would be—have an affirmative defense as to some and not have an affirmative defense to others, and I tried—I thought I had pointed that out to you at the beginning that—

"[Second Juror]: We—we sort of understood it to mean to take the affirmative defense for each charge, not as—clumped.

"The Court: Well, no, I mean, in other words, the process was to determine and find if the accused was or was not guilty of—of any of the charges that were charged. Obviously, if you found that the accused was not guilty of any particular charge, the verdict was not guilty. If you found that the person was guilty of any particular charge, you would find unanimously that he was guilty, but then you would go on to determine the affirmative defense, and if you found that the affirmative defense was proven by a preponderance of the evidence, then on those particular charges you would find him not guilty by reason of the—the affirmative

defense because, at that point, I have to know which ones are not guilty pure and simple because the state failed to prove him guilty, and which ones the state was successful in proving him guilty beyond a reasonable doubt but you are discharging him on the basis of the affirmative defense.

"But, you can't find him guilty on some charges and—and excuse him as—as not guilty by basis of the affirmative defense. You—it—it's inconsistent because either he was capable or incapable, as I've described the defense, at that particular time of all the charges. So, that it's—it's—it's in that situation.

"If you need further deliberations before I do the so-called Chip Smith charge which is basically an explanation of what thought process you should go through if you're deadlocked, then I would suggest that you continue your deliberations. All right?

"[Second Juror]: Okey-doke.

"[First Juror]: May we continue them?

"The Court: OK."

The defendant failed to object to this supplemental instruction.[9] The jury was then sent back to continue its deliberations. Within minutes, the jury returned, finding the defendant guilty on all counts. The following day, the defendant filed a motion for a new trial alleging the jury was misled during deliberations by the trial court's supplemental instructions. The court denied the defendant's motion.

The defendant first claims that the trial court's supplemental instructions on the affirmative defense of mental disease or defect misled the jury and deprived

---

[9] The defendant argues that within a very short time, perhaps a few minutes, after the jury was excused to continue deliberations, a verdict was announced, leaving little time to formulate an objection.

the defendant of his right to a fair and impartial trial. The defendant did not preserve this claim on the record. Moreover, the defendant does not seek review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), or plain error review. Practice Book § 4185. Rather, the defendant has raised this issue through his second claim that the court "erred when it denied [his] motion for a new trial." This motion was entirely predicated on the alleged improper supplemental instruction, hence, the defendant's two claims on appeal are, in essence, identical.

Our review of this claim, under the particular circumstances of this case, leads us to conclude that the supplemental instruction given by the trial court was not improper. While we agree that such an instruction may be improper under some or even most circumstances, in the present case it was not.

The defendant relied on the affirmative defense of mental disease or defect. "As with other affirmative defenses, the defendant has the burden of proof by a fair preponderance of the evidence." *State* v. *Zdanis*, 182 Conn. 388, 390, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). " '[T]he ultimate determination . . . [is] one of fact for the trier, aided by the expert testimony . . . but left to its own factual determinations.' " *State* v. *Steiger*, 218 Conn. 349, 383, 590 A.2d 408 (1991). The jury, as trier of the facts, may accept or reject the evidence presented by the defendant and may choose to believe or disbelieve expert testimony even when uncontroverted. *State* v. *Blades*, 225 Conn. 609, 629, 626 A.2d 273 (1993). On the basis of the facts as presented, and the jury's right to reject any or all of the defendant's evidence, we conclude that the trial court properly denied the defendant's motion for a new trial.

There is no question that the trial court's initial instructions were clear and sufficient to provide guid-

ance to the jury in applying the law to the facts it found established. The jury was instructed that the affirmative defense of disease or mental defect is a complete defense to criminal liability, which if established by the defendant, results in a verdict of not guilty by reason of mental disease or defect. The defendant, however, claims that the court's supplemental charge requires that he be found either competent or incompetent throughout the entire series of acts, comprising five separate charges, for conduct taking place over a period of approximately one hour. The defendant argues that it is "certainly conceivable that [he] was in control of his conduct during part of the evening and then lost control at a certain point." While we agree that such is conceivable; see *State* v. *Wood*, 208 Conn. 125, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988), our review of the record does not disclose that the defendant sustained his burden of proof that he was either not in control at all times or, that he "lost control" at a certain point during the entire continuum of the event.

During his case-in-chief, the defendant presented a clinical psychologist as an expert witness to testify regarding the defendant's mental state on the day of the crimes. The witness testified that, in his opinion based on his examination of the defendant, the defendant had not been suffering from a mental disease or defect at the time in "psychological nomenclature" but, probably had been from a legal standpoint. Two inmates also testified as to the defendant's mental state. The theory of defense was that the defendant was not in his right state of mind throughout the one hour ordeal.

During closing argument, the defendant, through counsel, argued that "throughout the entire ordeal [the defendant] was acting in a totally irrational unpredictable manner . . . ." All of the questions asked of witnesses by the defense counsel were designed to elicit

a response indicating that the defendant was acting under the influence of a mental disease or defect throughout the entire incident. It was the state's claim that he was not suffering from a mental defect throughout the entire one hour incident, and it was the defendant's position and claim that he was.

The defendant's theory of defense was an all or nothing affirmative defense of mental disease or defect. There was no evidence presented by any witnesses, nor was any argument advanced, that the defendant's mental state changed during the one hour incident or that something occurred to trigger a change in his mental state. Under the limited facts of this particular case, there was no evidence presented that would have allowed the jury to find that the defendant was lucid during part of the incident and under a mental defect at other times. There was evidence that he was under a mental defect throughout, and evidence that he was not. The jury chose to accept the latter and not the former as fact. Our Supreme Court has recognized that "a condition of mental disease is always a more or less continuous one . . . ." *Taborsky* v. *State*, 142 Conn. 619, 629, 116 A.2d 433 (1955). This concept is not inconsistent with the parties' positions and the court's subsequent charge.

Our review of the charge in its entirety demonstrates that the trial court's instructions sufficiently guided the jury to a proper verdict. The supplemental charge, as part of the whole, was not misleading or improper under the particular circumstances of this case.

The judgment is affirmed.

In this opinion the other judges concurred.