STATE OF CONNECTICUT *v.* VICTOR VELASCO
(SC 16134)

Borden, Katz, Palmer, Sullivan and Vertefeuille, Js.

Argued January 20—officially released May 16, 2000

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, was *Jonathan Benedict*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The principal issue raised by this appeal[1] is whether General Statutes § 53-202k[2] permits the trial court, rather than the jury, to find that a defendant, who was convicted by a jury of a class A, B or C felony, had used a firearm in the commission of such felony. The defendant, Victor Velasco, was charged with the crimes of felony murder in violation of General Statutes § 53a-54c[3] and conspiracy to commit robbery in the first

---

[1] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53-202k provides: "Commission of a class A, B or C felony with a firearm: Five-year nonsuspendable sentence. Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[3] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground

degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (3).[4] He also was charged under § 53-202k with committing robbery in the first degree with a firearm. Following a jury trial, the defendant was found guilty on the first two counts. The trial court rendered judgment and sentenced the defendant to a term of imprisonment of sixty years on the felony murder conviction, execution suspended after fifty years, and a twenty year concurrent term of imprisonment on the conspiracy conviction. The trial court then determined, from the evidence presented at trial, that the defendant had used a firearm in violation of § 53-202k. Accordingly, the trial court also imposed a five year sentence to run consecutively with the other sentences for the conviction under § 53-202k.

The defendant raises several issues on appeal. First, the defendant claims that because § 53-202k extends the maximum punishment beyond that which might otherwise be imposed upon conviction of an underlying class A, B or C felony, due process requires that the dispositive question of whether he used a firearm in the proscribed manner must be submitted to a jury. He claims further that, irrespective of whether due process safeguards apply to sentence enhancement statutes, the legislature did not intend for the ultimate factual question under § 53-202k to be determined by the court. Second, the defendant claims that the trial judge's ques-

to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

tioning of several witnesses, including the defendant himself, deprived him of a fair trial as guaranteed by the sixth amendment to the United States constitution,[5] and article first, §§ 8[6] and 19,[7] of the Connecticut constitution. Finally, the defendant claims that the trial court's instruction to the jury on the reasonable doubt standard improperly diluted the state's burden of proof.

We conclude that neither the trial court's questioning of witnesses nor its instruction on reasonable doubt was improper. Because we agree with the defendant, however, that when an accused is convicted by a jury of an underlying felony, the question of whether the accused used a proscribed firearm in the commission of that felony must also be decided by the jury, we conclude that the defendant's five year consecutive sentence under § 53-202k must be vacated.

The jury reasonably could have found the following facts. At approximately 10:45 p.m. on December 19, 1996, the defendant and another individual entered Maria's Variety Store in Bridgeport. The two men robbed the store, and one of them shot and killed the owner, Fernando Reis. Several eyewitnesses identified the defendant as one of the assailants who had robbed

---

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." The sixth amendment right to a jury trial is made applicable to the states through the fourteenth amendment due process clause. See *Duncan* v. *Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

[6] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. . . ."

[7] Article first, § 19, of the constitution of Connecticut provides: "The right of trial by jury shall remain inviolate."

the store. One witness, Kathryn Curwen, had been standing by the cash register talking with Reis when the defendant and another male, both dressed in black and wearing ski masks, entered the store. According to Curwen, one of the assailants wore a jacket with a black and gold emblem that read "Billion Bay," the same type of jacket that police later seized from the defendant. Both men were armed, and the defendant waved Curwen back by brandishing a handgun. Curwen heard one of the two men demand money and then heard a gunshot, but she did not see who had fired the shot. Thereafter, the taller of the two assailants put a nine millimeter gun to Curwen's head when a second customer refused to comply with his demand to retreat to the back of the store. After the assailants fled, Curwen called the police.

Officer Richard Mercado of the Bridgeport police department was patrolling the area on the night of the crime when he observed the defendant walking in the general vicinity of the variety store. The defendant matched the description of the suspect that had been broadcast over Mercado's police radio. Mercado detained the defendant and informed him that he was a suspect. The defendant denied any involvement in the shooting, but acknowledged that he was a member of the Latin Kings street gang. When the defendant was returned to the scene of the crime, Curwen identified him as one of the assailants. Three days later, Curwen singled out the defendant from a photographic array of eight potential suspects, each with black masks drawn over their eyes.

Jennifer O'Neill, another eyewitness, saw the defendant with another male outside of the store minutes before the shooting. She had stopped at the store to purchase some household items when she noticed two occupants "hunched up" in the back seat of a vehicle parked directly behind hers. Both individuals looked

up as she passed the vehicle and she was able to see their faces. As she was returning to her car, she was startled by a popping noise, and turned to see two people dressed in dark clothing and wearing hoods standing by the cash register inside the store. She also observed that the two individuals whom she had noticed minutes earlier were no longer in the vehicle. She did not learn until the next morning that Reis had been murdered. On December 29, 1996, O'Neill identified the defendant from a photographic array as one of the individuals in the car.

Frank Santos was working in the store on the night of the robbery. He did not notice that two men had entered the store until he heard a gunshot, at which point he fell to the floor to avoid detection. The taller of the two assailants discovered Santos, put a gun to his head, and moved him to the back of the store, while the other assailant stuffed a bag with money from the cash register. As to his emotional state throughout the incident, Santos acknowledged that he was a "manic depressive" who "started seeing flashes [and] got real scared." He was "upset," "hysterical" and "crying" throughout the episode.

According to Santos, the shooter was "a pretty big guy," about 185 pounds and about six feet tall. He was able to recall "the bigger guy" because of his eyes. The accomplice had a smaller build, with "braids or something sticking out of the hat . . . ." Both the shooter and his accomplice had worn black ski masks at the time of the robbery. When the police brought the defendant back to the scene, Santos could not identify the defendant as one of the perpetrators. He cautioned, however, that "I really can't say because they had ski masks on and everything . . . ."

In addition to these eyewitnesses, Nadine Huertas, a longtime friend of both Reis and the defendant, had

seen the defendant at some point in November, 1995, with a handgun similar to the one Curwen had described as having been used during the shooting. According to Huertas, when she told the defendant that Reis had spoken harshly about him, the defendant threatened to "leg" Reis, meaning to shoot him in the leg or knee.

According to Donald Armatino, Jr., a member of the Latin Kings who had been incarcerated with the defendant while the defendant was awaiting trial, the defendant had bragged about the killing and had given him a map that described the type and location of the gun used in the shooting. Armatino had turned the map over to the state police, who later located the gun by following the map to the stairwell of a house in Bridgeport. Additional facts will be set forth as necessary.

At the conclusion of the trial, the court related its understanding as to the § 53-202k charge. Specifically, the trial court stated that because the statute is a sentence enhancement provision, and sentencing is a judicial function, the court alone should deal with the issue of whether a gun had been utilized in the manner charged. Accordingly, the court removed the third count of the information from the jury's consideration.

The jury returned a verdict of guilty on the first two counts of felony murder and conspiracy. At the sentencing proceeding, the court determined that, on the basis of the evidence presented at trial, the state had proven beyond a reasonable doubt that the defendant had in fact committed the underlying felony by use of a proscribed firearm. Accordingly, the court sentenced the defendant, in addition to a sixty year term on the felony murder conviction, with execution suspended after fifty years, and a concurrent twenty year term on the conspiracy conviction, to a mandatory consecutive five year sentence pursuant to § 53-202k. This appeal followed.

I

The defendant first claims that the trial court, in finding that he had used a firearm in the commission of the underlying felony, violated his federal and state constitutional rights, namely, his due process right to a trial by jury as guaranteed under the sixth amendment to the United States constitution, and article first, §§ 8 and 19, of the Connecticut constitution. Alternatively, the defendant claims that the trial court misinterpreted § 53-202k.[8] The state, on the other hand, maintains that because this court has held that § 53-202k constitutes a sentence enhancement provision, and does not create a separate and distinct crime; see *State* v. *Dash*, 242 Conn. 143, 146, 698 A.2d 297 (1997); due process safeguards, including the right to a jury determination of ultimate factual issues, do not apply. Therefore, the state argues, the trial court's interpretation of the statute was proper. We agree with the defendant that the trial court misread the legislature's intent in determining for itself whether the defendant had used a firearm in the commission of the underlying felony, and consequently, we conclude that the defendant's sentence under § 53-202k must be vacated.[9]

[8] The defendant maintains that because he was told by the trial judge that he did not have a right to a jury determination on the § 53-202k allegation, he cannot be found to have knowingly and voluntarily waived that right. The state, however, does not claim that the defendant waived his right to a jury trial under § 53-202k. We therefore need not determine whether the defendant waived his right.

[9] The defendant acknowledges that he did not object to the trial court's decision. He therefore seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see footnote 20 of this opinion; and Practice Book § 60-5. Because our holding is based on fundamental tenets of statutory construction, we need not address whether the defendant's constitutional claim is reviewable under *Golding*. The defendant's statutory claim, however, falls under the plain error doctrine.

Practice Book § 60-5 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly

A

Our analysis is governed by well established principles of statutory construction. Statutory construction is a question of law and, therefore, our review is plenary. See id., 146–47. "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative his-

raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

We previously have held that "[p]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995)." (Internal quotation marks omitted.) *Santopietro* v. *New Haven*, 239 Conn. 207, 216, 682 A.2d 106 (1996). "An important factor in determining whether to invoke the plain error doctrine is whether the claimed error result[ed] in an unreliable verdict or a miscarriage of justice. . . . Plain error review may be appropriate where consideration of the question is in the interest of public welfare or of justice between the parties." (Citation omitted; internal quotation marks omitted.) *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 426, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997). Plain error review is also appropriate in matters involving statutory construction because "the interpretation of [a] statute and the resolution of [the] issue does not require further fact-finding . . . ." *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 39, 699 A.2d 101 (1997); *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 38 (plain error doctrine invoked "where the record is complete and the question is essentially one of law, so that neither party is prejudiced"). Under such circumstances, the parties are not prejudiced by our review of the underlying claim.

We conclude that the plain error doctrine applies in this case. The present appeal presents a "strictly legal question that requires no finding of facts." *Sicaras* v. *Hartford*, 44 Conn. App. 771, 786, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997); see *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993). "Both parties have had the opportunity to present arguments regarding their proposed statutory interpretation in their appellate briefs." *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 38. Accordingly, neither party is prejudiced by our decision to invoke the plain error doctrine under the circumstances of this case.

tory and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Parra*, 251 Conn. 617, 622, 741 A.2d 902 (1999).

"Several additional tenets of statutory construction guide our interpretation of a penal statute. . . . [C]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . *State* v. *Jones*, 234 Conn. 324, 340, 662 A.2d 1199 (1995). . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state. *State* v. *Ross*, 230 Conn. 183, 200, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995)." (Citation omitted; internal quotation marks omitted.) *State* v. *Dash*, supra, 242 Conn. 147.

## B

Section 53-202k was enacted "as part of a comprehensive legislative plan for dealing with assault weapons." Id., 148. It provides for a mandatory five year term of imprisonment whenever a defendant, "in the commission of [any class A, B or C] felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3 . . . ." General Statutes § 53-202k. As we stated previously, the five year sentence runs consecutively with, and is in addition to, the sentence imposed for the underlying felony.

The statute does not expressly delegate to the jury the task of determining whether a firearm was used during the commission of an applicable felony. We therefore discern the legislature's intent by examining

the relevant legislative history, including the statute's relationship to existing legislation on the fair assumption that the legislature is unlikely to intend any radical departure from well established practice. See *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 461–64, 704 A.2d 222 (1997) (comparison between statutory provisions yields conclusion that individuals can be held personally liable for wage violation under General Statutes § 31-72); *State* v. *Dash*, supra, 242 Conn. 150 n.8 (comparing § 53-202k with persistent offender enhancing provisions in determining that statute does not create substantive crime).

In *State* v. *Dash*, supra, 242 Conn. 150 n.8, we acknowledged that § 53-202k constitutes a sentence enhancement provision akin to the persistent offender provisions of General Statutes § 53a-40[10] that provide

[10] General Statutes § 53a-40 provides: "Persistent offenders: Definitions; defense; authorized sentences. (a) A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or third degree, aggravated sexual assault in the first degree, sexual assault in the third degree with a firearm, robbery in the first or second degree, or assault in the first degree, and (2) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution, for any of the following crimes: (A) The crimes enumerated in subdivision (1) of this subsection, murder, or an attempt to commit any of said crimes or murder; or (B) prior to October 1, 1975, any of the crimes enumerated in section 53a-72, 53a-75 or 53a-78 of the general statutes, revision of 1958, revised to 1975, or prior to October 1, 1971, in this state, assault with intent to kill under section 54-117, or any of the crimes enumerated in sections 53-9, 53-10, 53-11, 53-12 to 53-16, inclusive, 53-19, 53-21, 53-69, 53-78 to 53-80, inclusive, 53-82, 53-83, 53-86, 53-238 and 53-239 of the general statutes, revision of 1958, revised to 1968, or any predecessor statutes in this state, or an attempt to commit any of said crimes; or (C) in any other state, any crimes the essential elements of which are substantially the same as any of the crimes enumerated in subdivision (1) or (2) of this subsection.

"(b) A persistent serious felony offender is a person who (1) stands convicted of a felony, and (2) has been, prior to the commission of the present felony, convicted of and imprisoned under an imposed term of more than one year or of death, in this state or in any other state or in a federal correctional institution, for a crime. This subsection shall not apply where

the present conviction is for a crime enumerated in subdivision (1) of subsection (a) of this section and the prior conviction was for a crime other than those enumerated in subsection (a) of this section.

"(c) A persistent larceny offender is a person who (1) stands convicted of larceny in the third degree in violation of the provisions of section 53a-124 in effect prior to October 1, 1982, or larceny in the fourth, fifth or sixth degree and (2) has been, at separate times prior to the commission of the present larceny, twice convicted of the crime of larceny.

"(d) A persistent felony offender is a person who (1) stands convicted of a felony other than a class D felony, and (2) has been, at separate times prior to the commission of the present felony, twice convicted of a felony other than a class D felony.

"(e) It shall be an affirmative defense to the charge of being a persistent offender under this section that (1) as to any prior conviction on which the state is relying the defendant was pardoned on the ground of innocence, and (2) without such conviction, the defendant was not two or more times convicted and imprisoned as required by this section.

"(f) When any person has been found to be a persistent dangerous felony offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, shall sentence such person to a term of imprisonment of not more than forty years and, if such person has, at separate times prior to the commission of the present crime, been twice convicted of and imprisoned for any of the crimes enumerated in subdivision (2) of subsection (a) of this section, sentence such person to a term of imprisonment of not more than life.

"(g) When any person has been found to be a persistent serious felony offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest, the court in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, may impose the sentence of imprisonment authorized by said section for the next more serious degree of felony.

"(h) When any person has been found to be a persistent larceny offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest, the court, in lieu of imposing the sentence authorized by section 53a-36 for the crime of which such person presently stands convicted, may impose the sentence of imprisonment for a class D felony authorized by section 53a-35, if the crime of which such

for an enhanced prison term beyond that applicable to the charged offense whenever an accused is found to have been convicted previously of an enumerated crime. With respect to persistent offender statutes, it had long been established prior to the 1993 enactment of § 53-202k; see Public Acts 1993, No. 93-306, § 9 (P.A. 93-306); that the task of determining the existence of a designated fact that might compel the imposition of a sentencing term beyond that otherwise applicable to the underlying crime, falls upon the jury. In *State* v. *Ferrone*, 96 Conn. 160, 171–76, 113 A. 452 (1921), this court stated plainly that in criminal matters involving defendants charged as persistent felony offenders,[11] and thereby subject to an enhanced sentence, the jury must address two questions. "[F]irst, was the defendant guilty of the crime charged? . . . Second, if guilty, had the defendant . . . been convicted, sentenced and imprisoned? . . . The jury must by their verdict answer each of these issues. . . . [I]f the accused be found guilty on [each] issue . . . then the maximum punishment prescribed by the statute must be the sentence of the court." (Internal quotation marks omitted.) Id., 172–73.

person presently stands convicted was committed prior to July 1, 1981, or authorized by section 53a-35a, if the crime of which such person presently stands convicted was committed on or after July 1, 1981.

"(i) When any person has been found to be a persistent felony offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest, the court, in lieu of imposing the sentence authorized by section 53a-35a for the crime of which such person presently stands convicted, may impose the sentence of imprisonment authorized by said section for the next more serious degree of felony; provided the sentence imposed may not be less than three years, and provided further three years of the sentence so imposed may not be suspended or reduced by the court."

[11] *Ferrone* involved application of the indeterminate sentence statute, then codified at General Statutes (1918 Rev.) § 6660, which provided in relevant part that "when any person [sentenced for a noncapital offense] shall have twice before been convicted, sentenced and imprisoned in a state prison or penitentiary, the court shall sentence said person to a maximum of thirty years . . . ." See *State* v. *Ferrone*, supra, 96 Conn. 172.

We implicitly reaffirmed the principle articulated in *Ferrone* by holding in *State* v. *Wright*, 207 Conn. 276, 287, 542 A.2d 299 (1988), that under the persistent dangerous felony offender provision of § 53a-40 (a), a trial judge may properly determine the defendant's prior conviction status only after a knowing and voluntary waiver of the right to a jury trial by the defendant. See also *State* v. *Groomes*, 232 Conn. 455, 475–76, 656 A.2d 646 (1995) (judge determines prior conviction under § 53a-40 only after defendant knowingly and voluntarily waives jury right). We recognized that in pleading guilty to a persistent offender charge, the accused "waives several constitutional rights," including the right to a jury determination of ultimate facts that trigger the enhanced sentence.[12] *State* v. *Wright*, supra, 287. Thus, although § 53a-40 constitutes a sentence enhancement provision, and not an independent criminal offense; see *State* v. *Fullwood*, 194 Conn. 573, 587, 484 A.2d 435 (1984); the predicate fact of prior conviction must nevertheless be found by a jury before a judge can disregard the applicable ceiling and sentence a defendant to a greater term of years. Whether the accused qualifies as a persistent offender subject to an enhanced penalty upon conviction of a subsequent crime is a question routinely submitted to the jury. See, e.g., *State* v. *Milardo*, 224 Conn. 397, 400, 618 A.2d 1347 (1993) (reviewing adequacy of trial court's charge wherein jury convicted defendant under persistent serious felony offender statute); *State* v. *Bowman*, 46 Conn. App. 131, 132, 698 A.2d 908 (1997) (jury finds defendant guilty under persistent dangerous felony offender statute); *State* v. *Elliott*, 39 Conn. App. 789, 790–91, 667 A.2d

---

[12] Indeed, by pleading guilty to the persistent offender sentencing statute, an accused waives a host of procedural safeguards traditionally associated with jury determinations of fact, including "the rights to have the state's attorney present evidence, to have a trial and to have an opportunity for . . . counsel to cross-examine the appropriate witnesses . . . ." *State* v. *Williams*, 173 Conn. 545, 556, 378 A.2d 588 (1977).

1301 (1995) (jury determined that defendant qualified as persistent felony offender subject to enhanced sentence); *Evans* v. *Commissioner of Correction*, 37 Conn. App. 672, 687, 657 A.2d 1115, cert. denied, 234 Conn. 912, 660 A.2d 354 (1995) (jury determined defendant's persistent offender status upon testimony of correction center's records clerk); *State* v. *Banta*, 15 Conn. App. 161, 173, 544 A.2d 1226, cert. denied, 209 Conn. 815, 550 A.2d 1086 (1988) (acknowledging jury's role in determining existence of prior conviction that triggers enhanced sentence for subsequent conviction).

As we stated in *State* v. *Dash*, supra, 242 Conn. 150 n.8, § 53-202k is markedly similar to our persistent felony offender statutes. In specific, both statutes constitute sentence enhancement provisions, the application of which turns on the existence of a predicate fact that does not itself reflect an element of the underlying offense. "[T]he only difference between § 53-202k and § 53a-40 is that the former requires proof of the commission of an offense [with a firearm], while the latter requires proof of a prior conviction." Id. We are persuaded therefore that, in the absence of a clear statement to the contrary, in enacting § 53-202k, the legislature intended to prescribe procedural safeguards with respect to the identity of the fact finder that are analogous in scope to those that apply to factual determinations made pursuant to § 53a-40.[13]

[13] Our conclusion that the similarities between § 53a-40 and § 53-202k warrant analogous procedures pertains only to the identity of the fact finder, and does not extend to the use of a separate part B information in conjunction with prosecutions under § 53-202k. As we stated in *State* v. *Jones*, supra, 234 Conn. 347, persistent offender provisions are enforced through the use of a part B information so as not to prejudice the accused on the original charge by having the jury hear evidence in the first part of the trial regarding the accused's prior criminal convictions. See also *State* v. *Banta*, supra, 15 Conn. App. 173 (two part information required when proof of defendant's prior conviction used to enhance punishment for contemporaneous conviction of substantive offense). Unlike the proscribed use of a qualifying firearm, prior convictions are facts that have no legitimate bearing on the actual crime at issue. Such facts nevertheless increase the probability that the jury

The legislative debates surrounding the enactment of § 53-202k indicate no intention on the part of the General Assembly to deviate from the well established practice of submitting to the jury the ultimate fact that triggers the application of a sentence enhancement statute. As we stated previously in *Dash*, § 53-202k represents one component of "a comprehensive legislative plan for dealing with assault weapons." Id., 148. A major theme of the legislative debates surrounding P.A. 93-306, the precursor to § 53-202k, was the constitutional implications related to the various provisions of the proposed laws, including the due process right to "fair warning" as it pertains to the implementation of any new criminal law statute; see 36 H.R. Proc., Pt. 33, 1993 Sess., pp. 11,706–708, remarks of Representatives Michael P. Lawlor and Richard D. Tulisano; the right to remain free from self-incrimination, as implicated by the proposed certification requirement applicable to preexisting ownership of designated assault weapons; see 36 H.R. Proc., Pt. 32, 1993 Sess., pp. 11,624–25, remarks of Representatives Lawlor and Peter Metz; and the right to bear arms under article first, § 15, of the Connecticut constitution, as implicated by the outright ban on certain high power assault weapons. See 36 H.R. Proc., Pt. 33, 1993 Sess., pp. 11,830–35, 11,837, remarks of Representatives Arthur O'Neill and Michael J. Jarjura. In light of this discussion, it is likely that one or more members of the General Assembly would have objected

will infer a predisposition to commit the crime with which the defendant stands charged when the evidence pertains to similar misconduct engaged in previously. See *State* v. *Jones*, supra, 345, citing *State* v. *Geyer*, 194 Conn. 1, 15, 480 A.2d 489 (1984). These same concerns do not accompany the submission of evidence relevant to a factual determination under § 53-202k. Indeed, the proscribed use of a qualifying firearm requires additional factual findings relevant to the offense itself, not to the nature of the offender, and is thereby typically established by the same evidence used to demonstrate culpability for the underlying felony. Under such circumstances, there is little, if any, prejudice to the accused that would warrant the use of a separate part B information.

had the proposed legislation dispensed with the jury's role under the firearms enhancement provision. This is especially so given the timing of this debate, which followed decisions by this court discussing the constitutional significance of a defendant's right to a jury determination of the ultimate fact that triggers an enhanced sentencing term.

Finally, had the legislature intended to dispense with a jury finding under § 53-202k, that fact would likely have been articulated in the responses to remarks made by Representative Andrew M. Norton. In specific, Norton analogized P.A. 93-306 to General Statutes § 53a-216 (b), a statute that he claimed was "so little used" as to be virtually ineffective in deterring crime. See id., pp. 11,836–37. Section 53a-216 (b) is a substantive penal statute that classifies the criminal use of a firearm as a class D felony subject to a minimum nonsuspendable five year sentence. As such, that statute entrusts the jury with determining whether a firearm was used in a proscribed manner. Yet, neither Norton, nor the proponents of P.A. 93-306 who responded to his concern, pointed to any procedural distinctions, such as the identify of the fact finder, between prosecuting a crime under § 53a-216 (b) and seeking an enhanced sentence subsequent to conviction pursuant to P.A. 93-306, now codified at § 53-202k. Accordingly, in the absence of any discussion regarding the potential diminution of the jury's fact-finding role, we will not presume that the legislature intended such a result when it enacted § 53-202k.

C

Our conclusion that the legislature did not intend to eliminate the role of the jury as fact finder under § 53-202k is further supported by the fact that other statutes expressly designate when a factual determination is to be made by a judge. For example, the persistent

offender statutes permit the imposition of an enhanced penalty "[w]hen any person *[is] found to be* a persistent . . . offender, *and the court is of the opinion* that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest . . . ." (Emphasis added.) General Statutes § 53a-40 (f) through (i). The statute thereby identifies those facts that must be evaluated by "the court," once the jury finds the triggering fact, that is, a prior conviction. See also General Statutes § 53a-40a (same language identifies fact finder under statute allowing enhanced penalty upon conviction of crime involving bigotry or bias); General Statutes § 53a-40d (utilizing similar language as it pertains to persistent offenders of crimes involving certain designated misdemeanors). The sentencing judge's authority to find facts is even more clear under General Statutes § 53a-44, which authorizes the imposition of a discretionary enhanced fine whenever an accused "has gained money or property through the commission of any felony, misdemeanor or violation . . . ." In providing that "the court shall make a finding as to the amount of the defendant's gain from the offense," § 53a-44 expressly designates the scope of the court's fact-finding authority.

We are persuaded that the grant of authority under these statutes for fact-finding by a sentencing judge is indicative of the legislature's understanding that, except in limited circumstances, the determination of ultimate facts remains the exclusive function of the jury. Had the legislature intended to deviate from that practice in the context of factual determinations made pursuant to § 53-202k, it "easily could have expressed this intent." *State* v. *Desimone*, 241 Conn. 439, 455, 696 A.2d 1235 (1997). In the absence of language to that effect, we are reluctant to interpret § 53-202k "to the detriment of a criminal defendant in light of the well established rule that penal statutes are to be interpreted strictly

against the state." Id.; see *State* v. *King*, 249 Conn. 645, 681, 735 A.2d 267 (1999); *State* v. *Cardwell*, 246 Conn. 721, 739, 718 A.2d 954 (1998); *State* v. *Burns*, 236 Conn. 18, 23, 670 A.2d 851 (1996).

## D

The defendant has challenged the trial court's authority under both the state and federal constitutions to determine whether he used a firearm in the commission of an underlying felony. This issue, however, has yet to be squarely addressed by applicable precedent.[14] Moreover, as stated previously, because our interpretation of § 53-202k is based on fundamental tenets of statutory construction we need not decide whether, following a jury trial, the defendant is *constitutionally* entitled to have the jury make the factual determinations required by the statute.[15]

[11] In *Jones* v. *United States*, 526 U.S. 227, 243 n.6, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), the United States Supreme Court expressly declined to address whether the jury right guarantees of the sixth amendment apply to facts that increase the maximum penalty for an underlying crime. Instead, the court resolved the issue of whether certain provisions of the federal carjacking statute constituted essential elements of an underlying crime, or factors that bear on the ultimate sentence to be imposed, as a matter of statutory construction, thereby disposing of the need to address the larger constitutional issue. See id., 243 (construing meaning of "serious bodily injury" under statute that exposes convicted defendant to enhanced penalty). Similarly, in *McMillan* v. *Pennsylvania*, 477 U.S. 79, 93, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Supreme Court upheld a statute that called for the imposition of a mandatory minimum sentence upon a finding by a judge that the defendant had committed an underlying felony by the use of a firearm, stating that "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." The court, expressly noted, however, that the statute operated solely to limit the trial court's discretion in selecting a minimum penalty within a prescribed range, but did not "[alter] the maximum penalty for the crime committed . . . ." Id., 87–88. Indeed, the *Jones* court confirmed "that the result [in *McMillan*] might have been different if proof of visible possession [of a firearm] had exposed a defendant to a sentence beyond the maximum that the statute otherwise set without reference to that fact." *Jones* v. *United States*, supra, 242, citing *McMillan* v. *Pennsylvania*, supra, 88.

[15] Although we do not decide this case on constitutional grounds; see footnote 9 of this opinion; we take this opportunity to clarify our statement in *State* v. *Dash*, supra, 242 Conn. 150 n.9, that § 53-202k is comparable to

E

Finally, we must determine whether the court's improper instructions regarding § 53-202k were harmless. The state maintains that any impropriety in the trial court's instructions was harmless because the guilty verdict on the underlying felony necessarily included a finding that a firearm had been used in the commission

the Pennsylvania statute at issue in *McMillan* v. *Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), in that it "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty . . . ." (Internal quotation marks omitted.) *State* v. *Dash*, supra, 150 n.9. Unlike in *McMillan*, which addressed a statute that called for the imposition of a mandatory minimum sentence upon a finding by a judge that the defendant had committed an underlying felony by the use of a firearm, the issue in *Dash* was whether § 53-202k created a sentencing enhancement provision or a separate crime upon which the defendant could be convicted. Consistent with our conclusion in *Dash*, we are persuaded by the bulk of legislative statements surrounding the passage of § 53-202k, that the statute constitutes a sentence enhancement provision rather than a provision that calls for the imposition of a mandatory minimum sentence. Indeed, as we noted in *Dash*, these statements themselves indicate that § 53-202k was intended not merely to restrict the judge's discretion to imposing a sentence within a prescribed range, but to expand upon the maximum range of sentences already available upon conviction. Id., 149. In specific, Representative Lawlor explained that "§ 53-202k was intended, [to add] five years to the end of whatever other sentence [a defendant is] receiving as a consequence of these acts. . . . This legislation requires five years to be tacked on to the end of [the] sentence [for the underlying felony] which must run consecutively and which cannot be suspended or reduced in any manner. So that would be in addition to the minimum mandatories that are already in existence for whatever the underlying crime was. So, it is *five additional years on top of the other sentence.* . . . 36 H.R. Proc., Pt. 33, 1993 Sess., pp. 11,727–28. Similarly, Representative Reginald L. Jones, Jr., stated that this legislation deal[s] with mandatory sentences that run consecutively and cannot be plea bargained. The purpose, of course, *is to make the penalties greater and greater* if you use these weapons. . . . Id., p. 11,725. Finally, Senator Alvin W. Penn explained that the legislation requires a mandatory five year sentence . . . in addition and consecutive to any imprisonment for the [underlying] felony. 36 S. Proc., Pt. 14, 1993 Sess., p. 4956." (Emphasis in original; internal quotation marks omitted.) *State* v. *Dash*, supra, 149. "These comments strongly suggest that the legislature, in enacting § 53-202k, merely sought to establish an additional penalty for a person who commits a class A, B or C felony with a firearm," rather than to compel the imposition of a predetermined minimum. Id.

of that felony. In specific, the state contends that, because the evidence produced at trial supported only one cause of death, namely, death by a bullet wound, proof of a violation under § 53-202k was intertwined with the elements necessary to find the defendant guilty of robbery, and hence felony murder. We disagree.

The court instructed the jury that "the only case you will have is the case of the first and second count in this information. Don't concern yourself with whether or not it is proof beyond a reasonable doubt that this accused utilized a firearm in the commission of either one or both, if you so find. That is no longer a concern. . . . The clerk will only inquire as to the first two counts." As the defendant correctly pointed out at oral argument in this court, a finding of guilt on those counts was not contingent on the defendant's use of a firearm.

The first count of the information charged the defendant with felony murder in violation of § 53a-54c. The predicate felony was § 53a-134 (a) (1) or (2). As the trial court correctly instructed the jury, in order to find the defendant guilty of felony murder, the jury must find that during the course of committing a qualifying felony, "he *or another participant* . . . cause[d] the death of [a] person other than one of the participants." (Emphasis added.) In this case, the underlying felony was first degree robbery. Again, the trial court correctly instructed the jury that a person is guilty of robbery in the first degree when "he *or another person* in the [robbery] causes serious physical injury to any person who is not a participant in the crime, or the participants are armed, *one or more*, with a deadly weapon." (Emphasis added.) Accordingly, the jury's guilty verdict on felony murder may have been predicated on its finding that a participant to the robbery, other than the defendant, was armed. Therefore, the verdict did not *necessarily* rest on a finding that the defendant himself was armed.

The second count of the information charged the defendant with conspiracy to commit robbery in the first degree in violation of § 53a-48. Similarly, a finding that the defendant was armed was not indispensable to the guilty verdict returned on the conspiracy count. The trial court correctly charged the jury that a guilty verdict required a finding that the defendant had entered into an agreement intending to commit a crime, and that an overt act in furtherance of that agreement had been undertaken "by *any one* of those persons [involved in the conspiracy]." (Emphasis added.) As with the felony murder conviction, the conspiracy conviction did not *necessarily* rest on a finding that the defendant himself was armed. Indeed, the jury properly could have found the defendant guilty of conspiracy upon concluding that he had agreed to commit a robbery, but that only his coconspirator had been armed.

In his concurring and dissenting opinion, Justice Sullivan concludes that the impropriety was harmless beyond a reasonable doubt because, based on the evidence presented at trial, the jury could not have reached a contrary finding with respect to the defendant's use of a firearm. In specific, Justice Sullivan contends that the jury reasonably could not have found otherwise because the evidence that the defendant had utilized a firearm in a proscribed manner was essentially overwhelming and undisputed.[16]

A jury instruction that improperly omits an essential element from the charge constitutes harmless error if "a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested and supported by overwhelming evidence*, such that the jury verdict would have been the same absent the error

---

[16] The state does not argue that the evidence produced at trial effectively cured the trial court's improper instructions. We nonetheless address this claim because it forms the basis of the concurring and dissenting opinion.

. . . ." (Emphasis added.) *Neder* v. *United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 114 L. Ed. 2d 35 (1999). In *Neder*, the defendant had been charged with, inter alia, filing false federal income tax returns. Id., 6. Specifically, the government alleged that the defendant had neglected to report more than five million dollars of income that he had received from loan proceeds. Id., 6, 16. The defendant challenged the characterization of the proceeds, but never argued that his false statements with respect to those proceeds could be found immaterial. Id., 16–17. At trial, the court failed to submit to the jury the element of materiality with regard to the tax fraud charge. Id., 6. The Supreme Court concluded that this impropriety was harmless because, in that case, "[t]he failure to report such substantial income incontrovertibly establishe[d] that [the defendant's] false statements were material to a determination of his income tax liability." Id., 16. In other words, because this element was uncontested and the evidence supporting materiality was so overwhelming, the Supreme Court concluded that the omission was harmless.

In *State* v. *Faust*, 237 Conn. 454, 469, 678 A.2d 910 (1996), we held that the trial court's failure to instruct the jury on an essential element of General Statutes § 53a-179b, rioting in a correctional institution, constituted harmless error. In *Faust*, it was undisputed that the incident had taken place at Garner Correctional Facility (Garner). Witnesses for both the state and the defense testified, not only that a riot had occurred at Garner, but that the defendant had been incarcerated at Garner at the time. Id., 471. Indeed, the defendant himself testified to both of those facts, but asserted only that he was not involved in the incident. Id. In light of that testimony, we concluded that the trial court's instruction to the jury that it need not consider whether Garner was a correctional institution, if it found that "[the incident] occurred at Garner," constituted harm-

less error. Id., 470. The evidence adduced at trial compelled the conclusion beyond a reasonable doubt that, "in the absence of the assumed improper instruction, the jury would have concluded that the charged violation of § 53a-179b had occurred at a correctional institution." Id., 471.[17]

Unlike the facts of *Faust*, the evidence in this case that the defendant utilized a firearm in the commission of the underlying felony was neither overwhelming nor uncontested. Unlike *Faust*, the defendant's testimony in this case did not establish the essential element omitted from the trial court's charge. Nor did the defendant concede that element. On the contrary, by his own testimony, the defendant not only denied any involvement in the shooting, but specifically denied being in possession of a firearm. The defendant specifically stated that, prior to arriving at the convenience store, he had given his gun to another individual in the car.

The defendant's testimony made the question of whether he utilized a firearm during the course of the robbery a contested issue. That the jury convicted him on both counts of the information means that it obviously concluded that he was involved in the crime. The guilty verdict, however, did not require a finding that he utilized a firearm; it required only a finding that he or another participant was in possession of a gun that was used to kill the victim. Although the jury rejected the defendant's testimony that he was not involved in the crime, we have no way of knowing whether they concluded that he also was armed. *State* v. *Medina*, 228 Conn. 281, 309–10, 636 A.2d 351 (1993) (jury can credit part of testimony while rejecting other part). For us to conclude as such would require "speculation

---

[17] Indeed, had it chosen to do so, the court appropriately could have taken judicial notice of the fact that Garner qualified as a "correctional institution" under § 53a-179b.

directed towards making a judgment that the jury has never made . . . ." *Neder* v. *United States*, supra, 527 U.S. 38 (Scalia, J., concurring and dissenting). This is particularly true in the present case in light of the trial court's express instructions to the jury not to consider whether the defendant had been armed.

Furthermore, although both Curwen and Santos testified to the fact that both perpetrators had been armed, Santos' testimony established that the defendant's use of a firearm was not uncontroverted. In specific, when asked whether he could see a gun that the defendant was allegedly carrying, Santos responded, "No, not clearly because, like I said, I was in a state of shock." Moreover, although it was undisputed that two individuals had been involved in the crime, defense counsel emphasized in his closing argument that "every bit of [physical] evidence relating to a weapon . . . [pertains to] a nine millimeter." All the evidence pointed to one bullet having been fired in connection with the incident. In light of the fact that the victim unquestionably died as a result of a single nine millimeter bullet wound, defense counsel's statement reasonably could be read as disputing the assertion that both perpetrators were armed.

*Neder* and *Faust* require both that the evidence be overwhelming and uncontested. Neither requirement is met here. Accordingly, the evidence did not demonstrate that the trial court's defective instructions were harmless beyond a reasonable doubt.[18]

Because we conclude that a finding that the defendant used a firearm was not indispensable to the verdict, and that the evidence neither overwhelmingly nor incontrovertibly established that the defendant was

---

[18] This perhaps explains why the state did not claim that the evidence was so overpowering as to render the impropriety harmless. See footnote 16 of this opinion.

armed, the only question remaining is whether § 53-202k applies when a participant to a qualifying felony, other than the defendant himself, utilizes a firearm in the manner proscribed by the statute. An affirmative answer to that question would require that we interpret § 53-202k, in effect, as an accomplice liability statute that subjects every participant in a crime to an enhanced sentence whenever any other participant is armed. This court has yet to determine whether an unarmed accomplice to an underlying felony falls within the scope of § 53-202k, and we decline to do so without the benefit of having received briefs from the parties on the subject. Accordingly, because the state did not present that issue as an alternate ground upon which to sustain the judgment, we decline to address it.

We are satisfied that, under the facts of this case, the evidence that the defendant utilized a firearm in violation of § 53-202k was neither overwhelming nor uncontested. Nor was a finding that the defendant utilized a firearm in the commission of an underlying felony implicit in the guilty verdict returned. We therefore cannot say with confidence that the impropriety did not contribute to the verdict obtained. Accordingly, we conclude that the trial court's failure to instruct the jury on whether the defendant utilized a firearm in violation of § 53-202k was not harmless beyond a reasonable doubt.

## II

The defendant also claims that the trial court deviated from proper standards of judicial conduct when it questioned certain witnesses. As a consequence of this questioning, the defendant alleges that the trial court deprived him of a fair trial as guaranteed by the due process clauses of both the state and federal constitu-

tions.[19] The defendant acknowledges that he did not object to the trial court's questioning and he therefore seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[20] Although we agree with the defendant that the record is adequate for our review of his constitutional claim, he cannot prevail because the trial court's behavior was not so egregious as to result in a clear violation of the defendant's constitutional rights.

"Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8 . . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . *State* v. *Gordon*, 197 Conn. 413, 424D–25, 504 A.2d 1020 (1985); see also *State* v. *Fernandez*, 198 Conn. 1, 10–11, 501 A.2d 1195 (1985). However, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not

---

[19] The defendant claims specifically that the trial court's questioning infringed upon his rights to an impartial jury, to present a defense, and to testify on his own behalf, as guaranteed by article first, § 8, of the Connecticut constitution, and the sixth and fourteenth amendments to the United States constitution. Because the defendant provides no argument that his rights under the state constitution are distinct from his federal constitutional rights, for purposes of this case we treat the rights as coextensive. See *State* v. *Provost*, 251 Conn. 252, 256 n.4, 741 A.2d 295 (1999).

[20] In *Golding*, we held that a defendant can prevail on an unpreserved claim of constitutional error "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40; see also *State* v. *Griffin*, 253 Conn. 195, 204, 749 A.2d 1192 (2000).

required to remain silent. . . . *State* v. *Fernandez*, supra, 11 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 30–31, 629 A.2d 386 (1993). "Whether or not the trial judge shall question a witness is within his sound discretion. The extent of the examination is likewise within his sound discretion. Its exercise will not be reviewed unless he has acted unreasonably, or, as it is more often expressed, has abused his discretion." (Internal quotation marks omitted.) *State* v. *Bember*, 183 Conn. 394, 401, 439 A.2d 387 (1981). "The trial judge can question witnesses both on direct and cross-examination. . . . [I]t may be necessary to do so to clarify testimony as [the judge] has a duty to comprehend what a witness says . . . [and] to see that the witness communicates with the jury in an intelligible manner. . . . While no precise theorem can be laid down, we have held that it is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth . . . and [intervene] where the witness is embarrassed, has a language problem or may not understand a question." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernandez*, supra, 12–13. "The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the merits of the trial. See [id.], 14–17 (impugning credibility of defense's only witness violated right to fair trial); but see *State* v. *Tatum*, 219 Conn. 721, 739–42, 595 A.2d 322 (1991) (questioning of witnesses did not serve to endorse state's view of case)." *State* v. *Woodson*, supra, 31.

A

Statements Made to Mercado

The defendant objects to statements made by the trial court following the testimony of Mercado, the police officer who had detained the defendant while he was

walking on Main Street shortly after the crime occurred. On cross-examination, defense counsel had asked Mercado whether "Main Street has a somewhat significant incline . . . ?" Mercado acknowledged that it did. On redirect, the state referred back to that testimony, stating to Mercado that "[y]ou indicated [Main Street] was a pretty steep incline." Mercado responded, "Yes." Thereafter, the trial court questioned Mercado as to whether the description of the street being steep constituted his own characterization of Main Street or that of the prosecutor. Mercado answered that it was the prosecutor's. The court then stated: "Don't do that. Don't do it in this courtroom again. Evidence comes from the witness stand. It's not injected into a case by a question by counsel. There is no way Main Street is steep. It is improper, inappropriate for him to put that word in that question. You don't know it and it could affect you."

The defendant claims that the trial court improperly assumed the role of a witness by contradicting an asserted fact with its statement that "[t]here is no way that Main Street is steep." Because Mercado himself acknowledged that he was not testifying that Main Street was "steep," however, the effect of the trial court's statement was to distinguish the prosecutor's characterization of Main Street from that of the witness. Part of the trial judge's responsibility to conduct the proceedings "in an atmosphere of perfect impartiality" includes the duty to restrict evidence to facts that are elicited from sworn witness testimony, not from prosecuting attorneys. See *State* v. *Lasky*, 43 Conn. App. 619, 635–36, 685 A.2d 336 (1996), cert. denied, 239 Conn. 959, 688 A.2d 328 (1997) (trial court properly instructed jurors that "evidence consisted only of the testimony of witnesses and the exhibits, and that questions [by counsel] were not evidence"); *Duve* v. *Duve* 25 Conn. App. 262, 269, 594 A.2d 473, cert. denied, 220 Conn. 911,

597 A.2d 332 (1991), cert. denied, 502 U.S. 1114, 112 S. Ct. 1224, 117 L. Ed. 2d 460 (1992), citing *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 150, 496 A.2d 476 (1985) (contempt finding improperly based on representations made by counsel); *People's Bank* v. *Perkins*, 22 Conn. App. 260, 263, 576 A.2d 1313, cert. denied, 216 Conn. 813, 580 A.2d 58 (1990) (in absence of sworn testimony, presentation of argument by counsel constitutes improper basis for determining factual issue).

Moreover, in the context of the trial, the significance of the court's statement was de minimis—the defendant himself acknowledges in his brief that the issue of whether Main Street was steep did not relate directly to his defense of mistaken identity. See *State* v. *McIntyre*, 250 Conn. 526, 534, 737 A.2d 392 (1999) (stricken testimony that defendant shot victim at close range did not undermine fairness of trial wherein fact of shooting did not bear on state's claim that shooting occurred during attempted robbery); *State* v. *Fernandez*, supra, 198 Conn. 14 (trial court's intervention improper where questioning of witness implicates defense's theory of case). Therefore, we decline to hold that the court's comments to Mercado deprived the defendant of his constitutional right to a fair trial.

## B

### Questioning of the Defendant

The defendant claims that certain remarks made to him by the trial court improperly depreciated his credibility in front of the jury. At trial, the defendant testified that he had been in a car outside the store with several other individuals, including two friends, Will Martinez and another person he knew only as "Junior." According to the defendant, he had stepped away from the vehicle to urinate, but did not go into the store. Upon his return, he observed Martinez running out of the store shouting "he's dead," followed by Junior who

responded, in effect, that the victim had reached for the gun. The defendant testified that, at that point, he fled from the scene with Junior, who discarded his black jacket and ski mask in the yard of a nearby house. The defendant acknowledged that the gun that Junior was carrying had in fact belonged to him, but stated that he had loaned that gun to Junior earlier in the evening. As they were fleeing from the scene, the defendant demanded the gun back from Junior and hid it under a porch. He acknowledged that he later had given Armatino, with whom he had been incarcerated while awaiting trial, a map to the location of the gun. The defendant testified further that the gun powder residue that detectives had found on his hands was the result of fireworks that he had set off earlier that evening.

On cross-examination, the defendant stated that he knew Junior only by that nickname, and that he did not know where either Junior or Martinez lived. In addition, he acknowledged that he had written a letter to Junior's sister, "Milly," in which he referred to the individual who had given him the fireworks. The defendant later identified that individual as "Benji." In response to the prosecutor's questioning, the defendant denied knowing the last name of either Benji or Milly. The defendant also denied knowing the last name of a friend he knew as "Chief" or that of Chief's sister, or the address of either individual.

At the close of the defendant's testimony, the trial court posed a series of questions, including whether the four unidentified individuals who were in the vehicle with the defendant on the night of the robbery had attended high school in this state. When the defendant indicated that he did not know, the trial court responded: "You don't know anything. Now, when your counsel asked you . . . I didn't want to cut in here because it's your testimony that controls. You said that you knew the two fellows in the back and the driver

knew you, did he?" The defendant responded, "No, he didn't know me." The trial court then asked the defendant how it was that he had not recognized the driver of the vehicle when, as he had testified earlier, both he and the driver were members of the Latin Kings street gang, and the driver knew to give him a Latin Kings salute earlier that evening. After the defendant explained that he had been in jail for some time, the court responded, "I understand that, but you didn't recognize or know him?" The defendant answered, "No."

The defendant claims that the trial court's statement that "[y]ou don't know anything" had the effect of depreciating his credibility before the jury, particularly in light of the insinuation raised by the state's cross-examination that he was misrepresenting the extent of his relationship with the other individuals on the belief that, if found, those persons might inculpate him in the crime. The state maintains that the trial court's remark merely reflects a confirmation of the defendant's own testimony.

We need not determine whether the trial court's remark served merely to clarify the defendant's testimony, or worked to disparage his trustworthiness as it is clear from the record that the remark itself did not give rise to a constitutional violation. The trial court did not comment expressly on the defendant's credibility. The trial court neither endorsed the state's theory; see State v. Tatum, supra, 219 Conn. 739–42 (questioning witness on failure to identify accused from photographic array did not serve to endorse state's view of case); nor commented on the significance of the defendant's inability to provide more detailed information. See State v. Woodson, supra, 227 Conn. 32 (fairness not undermined by trial court's conduct absent comment on significance of evidence). Under these circumstances, we decline to read into " 'the cold black and

white of [the] printed record' "; id., 31; a constitutional violation where none is readily apparent.

C

Questioning of Santos

The defendant also claims that the trial court improperly asked leading questions of Santos after he had testified that he was unable positively to identify the defendant as one of the two assailants involved in the robbery. As stated previously, Santos, who was working in the variety store at the time of the robbery, had testified that although he had witnessed the robbery, he could not identify the defendant as one of the perpetrators "because they had ski masks on and everything . . . ." In response to defense counsel's question of whether there was anything distinguishing about the shorter assailant's hair style, Santos answered that although "[i]t looked like he was stuffing [his hair] in [his mask]," it was difficult to discern because "he had [the money bag] up [near his face] for one point and when he was fixing his hat." Santos acknowledged that he did not get a good look at the accomplice, and that he was in shock at the time. He testified that for the most part, he was "scared," "upset," "hysterical" and "crying."

Santos further testified that he recalled stating to an investigator for the public defender's office that the accomplice wore a beaded hair style that he had tucked under his mask, but that he had not mentioned that fact to the police. Defense counsel later elicited from Santos that when the police had brought the defendant to the show-up that evening, he did not have long beaded hair.

Soon thereafter, the trial court questioned the accuracy of Santos' recollection by suggesting that "if [the mask] covered everything, you wouldn't have seen any-

thing in the hair unless it was sticking out an eye socket hole" and that unless that were true, "you wouldn't have any other characteristic to talk about in regard to [the assailant's] hair." The trial court also questioned Santos as to whether the assailant was carrying the bag of money with his left or right hand, which hand the assailant had placed near his eye, and whether Santos could see the gun that the assailant was carrying. When Santos acknowledged that he could not see the gun clearly because he "was in a state of shock," the court queried: "[Y]ou weren't able to see it clearly with a calm reflective eye. Is that what you are saying?" Santos answered affirmatively.

The court then asked whether Santos had been able to see what the assailant was doing with his free hand, namely, whether he was scratching his eye or tucking in loose hair. Santos replied that "he could have been adjusting the mask . . . ." The court then responded: "If someone was adjusting the mask, they would hold the fabric of it and pull it in place; is that correct?" Santos agreed, and the court continued: "You have no recollection of what he was actually doing . . . [y]ou don't know . . . [y]ou don't know if there was hair being stuck in . . . [o]r he was pulling the mask? I don't want to put any words in your mouth." Santos responded, "[t]hat is what it was. I really, like I said, by that time, I couldn't think clearly."

The defendant's claim relates to the form and persistence of the trial court's questioning of Santos.[21] In specific, the defendant maintains that the trial court's leading questions suggested appropriate answers to Santos that tainted his actual recollection of events. Moreover, the defendant claims that because the use of leading questions by a judge implies that the court

---

[21] The defendant did not object, either in his brief or at oral argument, to the subject matter of the court's questioning.

itself believes the truth of the suggested answer, the jury improperly was influenced by the disputed line of questioning. We disagree.

The defendant is correct that as a general matter, a trial court should hesitate to interject itself into the identification aspects of a criminal proceeding. See *People* v. *Williams*, 177 App. Div. 2d 527, 528, 575 N.Y.S.2d 915 (1991). We read the trial court's questioning of Santos, however, as an impartial attempt to clarify his testimony so to distinguish between what Santos thought the assailant was doing with the ski mask, and what Santos actually witnessed. By his own admission, Santos had established that his perception and recollection might have been affected by the traumatic nature of the events. Therefore, the trial court was fully within its discretion in questioning Santos to ensure that his testimony was communicated clearly to the jury. "Where the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding." (Internal quotation marks omitted.) *State* v. *Bember*, supra, 183 Conn. 403.

Moreover, Santos was not the only identification witness to the murder. As stated previously, two other individuals placed the defendant at the scene of the crime—Curwen positively identified the defendant as one of the individuals who had robbed the convenience store, while O'Neill placed him in an automobile outside of the store minutes before the robbery occurred. A third witness, Armatino, a member of the Latin Kings and an inmate with the defendant while he was incarcerated awaiting trial, testified that the defendant had bragged about the robbery, had described the gun used in the robbery as a nine millimeter, and had given him a map leading to the location of the gun. Accordingly, although trial courts must take care to ask questions

impartially; see id., 402; we do not see how the judge's questioning in this case, in light of the totality of the evidence presented at trial, could improperly have influenced the outcome of the proceedings. The trial court's conduct did not reflect upon the merits of the defendant's case, but was instead an attempt to ensure the orderly progress of the trial.

Finally, the trial court instructed the jury, with respect to all of the testimony elicited at trial, to disregard any questions posed by the court, and any answers to those questions offered by witnesses. The court stated: "Simply, you should not draw any inferences whatsoever from any questions I may have asked any witness in the case. If I did, give no consideration to the answers given to any questions which I may have asked." In the absence of an indication to the contrary, the jury is presumed to have followed these curative instructions.[22] See *State* v. *McIntyre*, supra, 250 Conn. 533; *State* v. *Correa*, 241 Conn. 322, 353, 696 A.2d 944 (1997). Accordingly, the defendant was not deprived of his right to a fair trial by the court's actions.

### III

The defendant claims finally that the court's instruction on the reasonable doubt standard violated his right to a fair trial as guaranteed by the due process clauses of the fourteenth amendment to of the United States constitution and article first, § 8, of the Connecticut constitution. In specific, the defendant objects to the

---

[22] The defendant states in his brief that "[a]ny hope of a curative effect was lost when the jury was also instructed that its assessment of the defendant's credibility 'necessarily involves a consideration of his interest in the outcome of this trial. You will also consider the importance to him in the outcome of the trial and his motive, if any, for telling the truth or not telling the truth.' " We read the defendant's reference to this statement as relevant only to whether the jury instructions were effective in curing the alleged error caused by the trial court's questioning, not as a separate claim of error pertaining to the adequacy of the instruction itself.

trial court's characterization of a reasonable doubt as "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence in the case." According to the defendant, this description improperly diluted the state's burden of proof. Because this issue was not properly preserved at trial, the defendant seeks relief under *State* v. *Golding*, supra, 213 Conn. 239–40.[23] Although we agree with the defendant that the record is adequate for our review of his claim, he has failed to establish a clear constitutional violation.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). [Consequently] [t]he defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt. . . . *State* v. *DelVecchio*, 191 Conn. 412, 419–20, 464 A.2d 813 (1983)." (Internal quotation marks omitted.) *State* v. *Griffin*, 253 Conn. 195, 205–206, 749 A.2d 1192 (2000).

On appeal, claims of instructional error are reviewed to determine "whether it was . . . reasonably possible that the jury was misled by the trial court's instructions

---

[23] See footnote 20 of this opinion.

. . . ." (Internal quotation marks omitted.) *State* v. *Delvalle*, 250 Conn. 466, 470, 736 A.2d 125 (1999). "[T]he charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . *State* v. *Schiappa*, 248 Conn. 132, 171, 728 A.2d 466 (1999); accord *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995)." (Internal quotation marks omitted.) *State* v. *Delvalle*, supra, 470–71.

In relevant part, the trial court's instruction on the burden of proof is as follows: "The accused is presumed to be innocent until he is proven guilty. . . . [Thus] the presumption of innocence alone is sufficient to acquit a defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case. This means that the state must prove every element necessary to constitute the crimes charged, as I will explain those elements to [you]. . . . The state can sustain the burden only if the evidence before you establishes the existence of every element constituting the crime charged beyond a reasonable doubt. . . . A reasonable doubt is a doubt for which a valid reason can be assigned. It is more than a guess or a surmise. It is a doubt based upon reason and common sense. It is that kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt is proof of such a compelling and convincing nature that you'd be willing to rely on it without hesitation in your most important affairs of life. A reasonable doubt,

in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence in the case."

The trial court's instruction reflects a detailed explanation of the reasonable doubt standard invoking language consistently accepted by this court. See, e.g., *State* v. *Griffin*, supra, 253 Conn. 205 (reasonable doubt is " 'a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence' "); *State* v. *Delvalle*, supra, 250 Conn. 475 (reasonable doubt must be " 'warranted by the evidence' "); *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522 (1998) (" 'reasonable doubt is a real doubt, an honest doubt' "); *State* v. *Small*, 242 Conn. 93, 114 n.17, 700 A.2d 617 (1997) (" 'reasonable doubt . . . is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence in a case' "); *State* v. *Ellis*, 232 Conn. 691, 705, 657 A.2d 1099 (1995) (" 'reasonable doubt is a doubt for which a valid reason can be assigned' "). We conclude therefore that the defendant has failed to demonstrate that the challenged instructions unconstitutionally diluted the state's burden of proof.

The judgment is reversed in part and the case is remanded to the trial court with direction to vacate the defendant's sentence under § 53-202k and for a new jury trial on the issue of whether the defendant used a proscribed firearm in the commission of the underlying offenses; the judgment is affirmed in all other respects.

In this opinion BORDEN, PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, J., concurring in part and dissenting in part. I agree with the majority's statutory analysis of General Statutes § 53-202k. I believe, however, that, under the facts of this case, the trial court's decision not to submit the § 53-202k matter to the jury for a factual determination of whether the defendant, Victor

Velasco, used a firearm in the commission of the crime was, although improper, harmless. Accordingly, I would not vacate the defendant's sentence under § 53-202k and would affirm the judgment of the trial court.

The defendant claimed at oral argument that, because his use of a firearm was not a required element of either felony murder or first degree robbery, and because the jury was instructed not to consider whether he had used a firearm, his conviction on both of those counts did not necessarily imply that he had used a firearm. The majority is persuaded by the defendant's argument. I am not.

The gist of the defendant's argument is that the jury improperly was instructed that it need not determine whether the state had proven an essential element of a § 53-202k violation. In determining whether the trial court's instruction to a jury that it need not consider an essential element of an offense is harmless, the reviewing court does not ask whether the defendant has admitted the omitted element, or whether the government has proven the element to a metaphysical certainty. The test is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error . . . . To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." (Internal quotation marks omitted.) *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (harmless error rule applied when trial court instructed jury that finding essential element of offense was for court, not jury). Therefore, the "court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the

omitted element. If the answer to that question is no, holding the error harmless does not reflec[t] a denigration of the constitutional rights involved. . . . On the contrary, it serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." (Citation omitted; internal quotation marks omitted.) Id., 19. I would answer no to the question of whether a rational fact finder could find, on the basis of the evidence presented at trial, that the defendant participated in the robbery, but did not display or use a gun.

Accordingly, I would find that, even though the defendant was, as the majority concludes, statutorily entitled to have a jury determine whether he displayed or used a firearm for purposes of establishing his culpability under § 53-202k, the trial court's decision not to submit that issue to the jury was harmless beyond a reasonable doubt. This is so even if it is assumed that the court's decision implicated the defendant's constitutional right to a trial by jury.

The majority concludes that there is a dispute about whether both participants in the robbery displayed firearms because the defendant denied both that he was a participant and that he was in possession of a firearm. The issue is not, however, whether the defendant admitted that he was one of the participants in the robbery or that he used a firearm. The issue is whether a rational jury, having concluded that the defendant was a participant, also could have concluded that he did not carry a firearm.

It is important to note that the defendant did not claim that, even if he did participate in the robbery, he did not use a gun. Nor did he claim that only one of the two participants in the robbery used a gun. Rather, in an attempt to explain why his gun had been used

during the robbery even though he allegedly did not participate—an explanation that the defendant apparently felt obliged to provide—the defendant claimed that he gave the gun to an associate minutes before the robbery and that he took it back minutes later when the associate ran out of the store. Although the jury could have inferred that the defendant gave a gun to an associate before the robbery and used a silver pistol himself,[1] there was no evidence from which the jury reasonably could have found that, contrary to the defendant's claim, he participated in the robbery, but that, in accordance with his claim, he did not possess a gun. In other words, the jury's rejection of the defendant's claim that he was not a participant necessarily implies its rejection of his claim that he did not have a gun.

Two bystander eyewitnesses, with no apparent motive to lie, testified that both participants in the robbery had guns. Kathryn Curwen, one of the eyewitnesses, testified without qualification that the shorter of the two participants in the robbery, who later was identified as the defendant, had a shiny revolver. She also testified that the participants "both had guns." Frank Santos, the other eyewitness, testified that the taller of the participants had a "Luger." When asked about whether the second participant had a gun, Santos testified that he "really didn't get a good look, but . . . thought [he] saw a silver revolver." On direct examination, Santos testified as follows:

"[Jonathan Benedict, State's Attorney]: And when [the second participant] ran out, he had a chrome pistol in one hand, correct?

"[Santos]: It looked like that, yes.

"[Mr. Benedict]: Some kind of gun?

---

[1] There was testimony that the defendant possessed both a black gun with a "clip" and a smaller silver gun prior to the robbery.

"[Santos]: Yeah."

Later, the court questioned Santos as follows:

"The Court: Did he place his left hand near his eye or his right hand?

"[Santos]: His left—his right.

"The Court: His right? Was his right hand carrying the gun or the bag of money?

"[Santos]: The gun.

"The Court: When he put the gun up there, could you see the gun?

"[Santos]: No, not clearly because, like I said, I was in a state of shock."

The majority states that "Santos' testimony established that the defendant's use of a firearm was not uncontroverted." When Santos' testimony is taken in context, however, it is clear that, at most, Santos was uncertain about the type of gun the second participant carried, not whether he carried one. Furthermore, even if it is assumed that Santos could not clearly see whether the second participant had a gun, that would, in no way, controvert Curwen's unequivocal and undisputed testimony that he did have one.

The majority's characterization of defense counsel's closing argument as "disputing the assertion that both perpetrators were armed" is also untenable. Contrary to the majority's reading, defense counsel did not argue, or even suggest, that only one participant in the robbery used a gun. Rather, defense counsel argued that Curwen's description of the second participant's gun as a "silver revolver" indicated that her identification of the defendant as a participant in the robbery was unreliable. Defense counsel's argument was based on evidence that tied both the defendant and the shooting to a nine

millimeter gun, specifically, evidence that the fatal wound was inflicted by a nine millimeter gun and testimony that the defendant, while in prison awaiting trial, had given information to a fellow prisoner concerning the location of the nine millimeter gun that had been used in the shooting. Defense counsel did not argue that a silver revolver was not used during the robbery, or that only one participant used a gun. Rather, he attempted to argue, albeit without factual or logical basis,[2] that, because the second participant used a silver revolver, the second participant could not have been the defendant. The jury, in convicting the defendant, clearly rejected this argument.

We are bound by *Neder* v. *United States*, supra, 527 U.S. 1, in our analysis of claims implicating the defendant's rights under the United States constitution.[3] Moreover, I find the rationale of the court's holding in *Neder* to be persuasive to the extent that the defendant's claims may implicate his rights under the Connecticut constitution. I, therefore, would uphold the defendant's sentence under § 53-202k.

[2] Even if the evidence did link the defendant with the nine millimeter gun used in the robbery, it certainly did not, as defense counsel attempted to suggest, rule out the possibility that it was the defendant who carried the silver pistol during the robbery. In fact, there was testimony that the defendant possessed both a silver-colored pistol and a larger black gun prior to the robbery, and the state conceded that the other participant in the robbery probably used the nine millimeter gun and inflicted the fatal wound. In any case, defense counsel's argument focused on the unreliability of Curwen's identification of the defendant as a participant in the robbery, and, in no way, impugned Curwen's testimony that both participants had guns.

[3] State courts must follow the United States Supreme Court's decisions interpreting the United States constitution. State courts may grant individuals more rights than those guaranteed by the United States constitution, but may do so only on the basis of state law. 1 R. Rotunda & D. Nowak, Constitutional Law: Substance and Procedure (3d Ed. 1999) § 1.6, pp. 70–71. Accordingly, to the extent that *Neder* is inconsistent with our case law precluding harmless error analysis in cases in which the United States constitution is implicated, that case law is superseded by *Neder*.

To the extent that the defendant also claimed that the court's instructions on the reasonable doubt standard violated his right to a fair trial under the federal and state constitutions, I agree with the majority that this claim must fail.

Accordingly, I respectfully concur in part and dissent from the majority's decision to vacate the defendant's sentence under § 53-202k.